## 8064

### DuBOSE v. KELL.

1. DEED—INSANITY.—In order to render a deed void there must be at the time of its execution such insanity or mental weakness or unsoundness as amounts to an incapacity or occasions an inability to understand or comprehend the subject of the contract or act and its nature and probable consequences.

2. IBID.—IBID.—The grantor here was not suffering from *senile dementia* at the time of the execution of this deed, nor from any other mental ailment which would render her act void.

3. DURESS.—UNDUE INFLUENCE consists in an influence which is so far operative as to destroy free agency, so as to compel the person doing the act to do the same against his will. Such influence must be proved unless the relation in which the parties stood to each other is such as to raise a presumption of its existence, and such presumption may be rebutted by evidence of fair, open dealing. Full recognition should always be given to the liberty of the party to obey the voice of justice, the dictates of friendship, of gratitude, of benevolence and the claims of kindred.

4. IBID.—IBID.—A DEED by an aged and feeble old lady, to one not her blood relation, *held* to have been executed without duress or undue influence, and in pursuance of a long cherished intention, and to be a deed of gift to him for his kindness to her in the past and her confidence in his kindness in the future, and that there is no evidence of abuse of that trust and confidence by the grantee.

5. AMENDING PLEADINGS—APPEAL.—Granting a motion during trial to amend a pleading so as to allege a life estate in one tract of land to conform to the proof is discretionary with the trial Judge and not appealable unless there was an abuse of discretion.

6. REHEARING *refused.*

Before ERNEST MOORE, special Judge, Chester, April, 1910. Affirmed.

Action by Sarah F. DuBose, in her own right, and as administratrix of Susan C. Kell against John A. Kell, W. R. Kell *et al.* The Circuit decree is:

"This cause came on for hearing at the November term, 1909, of the said Court, and was then submitted for determination of the equitable issues; but, further time for additional argument having been granted, the final submission was not made until a recent date. The cause was heard upon the report of the referee and numerous exceptions by the defendants.

"In the reports of the appeals herein, in 72 S. C. 215, and 76 S. C. 314, a view may be had of the preliminary proceedings in the case prior to the reference of the equitable issues. In these proceedings it was adjudged to be proper to determine the equitable issues before a hearing should be had upon any legal issues of fact herein as to the legal title to any of the lands here in question triable by jury.

"Before proceeding directly to the consideration of the report and exceptions, a brief statement of uncontroverted and conceded facts will be helpful by way of preface. The issues made by the pleadings need not be stated in detail, but reference will be made to them from time to time as occasion may require.

"The lands here in controversy consist of four tracts, situate in the county of Chester, known, respectively, as the 'Home Place,' which contains 1,300 acres; the 'Rocky Creek Place,' in which is included about 700 acres; the 'Parish Place,' consisting of 100 acres; and the 'Fishing Creek Place,' embracing 400 acres. All of these tracts were formerly the property of Mrs. Jane Hemphill, who died in the year 1861, leaving of force her last will and testament, by the terms of which she devised and bequeathed

to her daughter, Susan Douglas, who afterwards became Susan C. Kell, the one-third part of the residue of her estate, limiting the same to her, in the language of the sixth clause of the will, 'for the term of her natural life, for her sole and separate use, and not to be subject to the debts, contracts or control of her present or any future husband, and at her death I give and devise the same to any child or children which she may have. But in case she die without issue living at the time of her death, or if said issue should not arrive at the age of twenty-one years, then I give and devise the said portion to my daughter, Mary Hemphill. I authorize and empower my said daughter, Susan, to give, by will duly executed according to law, five thousand dollars to her present husband, or any other person she may desire, out of said portion.' By the same will testatrix gave all the rest and residue of her estate to her daughter, Mary Hemphill, in fee, and authorized and empowered her to dispose of the same to any person, by will or otherwise; 'this limitation and power to extend also to whatever she may derive from my daughter Susan's portion.'

"Under this will of Jane Hemphill, the said Susan C. Kell took (as her portion) the two tracts already mentioned as the 'Fishing Creek Place' and the 'Parish Place,' and the said Mary Hemphill took thereunder (as her portion) the aforementioned two tracts, the 'Home Place' and the 'Rocky Creek Place.'

"Mary Hemphill died about 1864, leaving of force her last will and testament, dated in 1862, which directed, first, the payment of her debts and then bequeathed the sum of ten thousand dollars to the board of directors of the Theological Seminary of South Carolina and Georgia, and devised the rest and residue of her estate to her executor in trust to pay the income thereof to her sister, Susan Douglas (afterward Susan C. Kell), for life, and the corpus to her issue, and in case of the death of the said Susan without issue, or of the death of the said issue before reaching

the age of twenty-one years, then the said rest and residue
is devised to certain other parties, strangers to this contro-
versy. By this will James Hemphill is appointed executor
and is empowered to sell such property as is necessary to
carry out its purpose and provisions.

"Mrs. Susan Douglas, having become Susan C. Kell by
her intermarriage with B. E. Kell, Sr., purchased the above
legacy of ten thousand dollars bequeathed to said Theolog-
ical Seminary by the will of Mary Hemphill, and in 1873,
an action was commenced in this Court by James Hemphill,
as executor of Mary Hemphill, deceased, and also as execu-
tor of Jane Hemphill, against the said Susan C. Kell and
her husband, B. E. Kell, and others, to which suit all the
persons in any way interested in the said two estates were
made parties, for the purpose of marshalling the assets and
partitioning and settling the said two estates. In this suit
it was determined that the said Susan C. Kell was the owner
of the said legacy and there was adjudged to be due to her
thereupon by the estate of Mary Hemphill, on the 20th day
of February, 1873, the sum of fifteen thousand and seventy-
five dollars; and by a decree in the said cause, the 'Home
Place' and the 'Rocky Creek Place,' were ordered to be sold
as the property of the said Mary Hemphill for the payment
of the same. These lands were so sold accordingly and
were purchased by the said Susan C. Kell at such sale on
December 1, 1873, and deeds for the same were thereupon
duly executed to her by the proper officer of the Court. It
appears from the records of said cause that, after applying
the proceeds of sale and all other payments, a large balance
remained due upon said decree in favor of Susan C. Kell
against the estate of Mary Hemphill.

"Under these proceedings, therefore, Susan C. Kell
acquired title in fee simple to the 'Home Place' and the
'Rocky Creek Place,' while she then had a life estate in
the 'Fishing Creek Place' and the 'Parish Place' under the
devise contained in the will of Jane Hemphill; and she fur-

·ther held a judgment or decree against the estate of Mary Hemphill for whatever balance remained due upon the said legacy established in the action above mentioned.

"On the 20th day of November, 1880, for a consideration expressed of two thousand and five hundred dollars, Susan C. Kell conveyed to one J. H. McMurray the 'Fishing Creek Place,' by a deed in fee simple with full warranty; and, on the same day, the said McMurray executed to her a mortgage thereupon to secure sealed notes to the amount of fifteen hundred dollars. On the 15th day of November, 1888, the said McMurray executed to B. E. Kell, Sr., the husband of Susan C. Kell, a mortgage to secure the payment of a sealed note of that date by him to said B. E. Kell, made payable in the sum of two hundred and fifty dollars, and bearing interest at the rate of ten per centum per annum. Thereafter, in December, 1892, the said J. H. McMurray conveyed the said 'Fishing Creek Place' to the said B. E. Kell, Sr., in fee simple, with full warranty, for a consideration therein named of 'five hundred dollars to me paid and in further consideration of his satisfying the balance of a mortgage covering premises hereinafter described,' the premises described being the said 'Fishing Creek Place.'

"In August, 1902, B. E. Kell, Sr., the husband of Susan C. Kell, died testate, his will thereafter duly probated bequeathing and devising all his property to his wife for life, and after her death to his nephew, B. E. Kell, Jr., absolutely.

"Thereafter, on the 27th day of October, 1902, the said Susan C. Kell signed the paper, bearing that date, purporting to be a deed of conveyance by her to the said Dr. B. E. Kell, Jr., of a fee simple title to the 'Home Place,' the 'Rocky Creek Place' and the 'Parish Place.' Although the execution of this paper by the said Susan C. Kell appears to have been proven before a notary public, on the 29th day of October, 1902, by the affidavit of one of the subscribing witnesses, there is no evidence that it has ever been recorded.

"Mrs. Susan C. Kell having died on the 24th day of December, 1902, leaving no issue, and Dr. B. E. Kell, Jr., having died on October 30th, 1903, but having previously conveyed all the property here in controversy to his brothers and sisters who are named as defendants herein, the present action seeking the cancellation of the deed of October 27th, 1902, by Susan C. Kell to Dr. B. E. Kell, and also a partition of the four tracts of land already mentioned, was commenced in this Court on the 14th day of October, 1904.

"At the time of the death of Susan C. Kell, her heirs at law were the plaintiff, Sarah DuBose, and the defendants, Susan A. Boylston and Eunice Cloud. This is alleged in the complaint and denied in the answer, but, whether proven or not, it was conceded at the hearing that such are the facts. A will made by Sarah C. Kell in 1885 is conceded to be inoperative by reason of the fact that the devisee of her property therein named died during her lifetime; and, for that reason, amongst others, the same was never probated. It is also admitted that any interest or estate in any of the lands here in controversy which the defendants, Eunice R. Cloud and Susan A. Boylston, may have at any time possessed, has passed by conveyance to the other defendants in this action.

"Coming now to the report of the referee upon the equitable issues in the case and considering first the questions sought to be made by the plaintiff's fifth exception, it appears clearly that this exception raises purely a question of legal title which depends upon the proper construction of the wills of Jane Hemphill and Mary Hemphill and perhaps also upon the question of fact as to who were the heirs at law of Mary Hemphill at the time of her death or at the time of Susan C. Kell's death, and that such question of title can only be tried upon the hearing of the legal issues in this case. As no waiver has been made of the right to trial by jury of this issue, the same must be left for determination upon the trial of the legal issues in this case.

"As to the first four exceptions by the plaintiff, these do raise equitable questions which are now to be determined.

"The referee does find that B. E. Kell, Sr., 'took up' the mortgage which was given by J. H. McMurray to Susan C. Kell for the purchase price of the Fishing Creek Place. What meaning was intended by the referee in using the expression above quoted is not altogether clear, but if there is any such finding as that B. E. Kell, Sr., had paid the mortgage to Susan C. Kell, there is nothing in the testimony of J. H. McMurray to warrant such finding nor has attention been called to any other evidence to sustain the same. Indeed, an examination of the context of the referee's report leads to the inference that he did not intend to make any such finding as that B. E. Kell, Sr., had paid the mortgage debt of J. H. McMurray to Susan C. Kell. While not so finding in express terms, perhaps, the referee does in effect find that B. E. Kell, Sr., did agree with J. H. McMurray to pay the purchase money mortgage due by the latter to Susan C. Kell.

"There is nothing in the evidence to show error in the finding by the referee of which complaint is made by the fourth exception. The evidence showed merely a purchase of this land by B. E. Kell, Sr., from J. H. McMurray, a payment by him of part of the purchase money in cash and an assumption of liability for the payment of a certain undesignated mortgage debt against the said land conveyed to him There is no evidence whatever that any money belonging to Susan C. Kell was used in the purchase of this land or applied in the payment of the purchase money thereof; but the evidence was simply of an assumption by the said B. E. Kell of responsibility for the payment of an unidentified mortgage debt upon the same. If it be assumed that the mortgage debt referred to was that owing to Susan C. Kell, this would only amount to an acknowledgment of liability for the payment of any balance that might be due thereon, but would not constitute a using of the money of Susan C.

Kell in the purchase of the land. Under such circumstances there is nothing upon which a resulting trust can be based, as even the assuming of the payment of a mortgage debt due to the wife of the grantee could not operate to raise a resulting trust in the land, but could occasion merely a liability by B. E. Kell, Sr., for the payment to her of the mortgage debt. See *Rogers* v. *Rogers,* 52 S. C., 288, and authorities there cited.

"There was no error in the holding by the referee, of which complaint is made by the second exception, and no error in the failing to hold that the acceptance by B. E. Kell of the deed from J. H. McMurray, containing the recital that said Kell should 'satisfy a balance of a mortgage covering the premises' conveyed, and the recording of such deed, was a sufficient compliance with the requirements of section 2449 of the Civil Code. The mere recording in a deed record book of a deed containing simply a recital that the grantee is to satisfy a balance to an unstated amount due to an undesignated person upon an unidentified mortgage not even stated to be owing by the grantor in the deed, would seem to come very far short of being a compliance with the statutory requirement that some written acknowledgment of the debt secured thereby must be 'recorded upon the record of such mortgage' in order that the same shall constitute a lien upon any real estate 'after the lapse of twenty years from the date of the creation of the same.'

"For these reasons, therefore, the first four exceptions by the plaintiff must be overruled.

"There was, however, error by the referee, as complained in the sixth exception, in failing to find and conclude that the judgment or decree for the payment of the legacy aforesaid against the estate of Mary Hemphill in favor of the said Susan C. Kell was and is presumed to be paid from lapse of time and barred by the statute of limitations. More than twenty years had elapsed since the rendition of this

judgment or decree and, if not barred, it must certainly be presumed paid after that lapse of time.

"But there was no error in the failure by the referee to make any finding as to whether or not the title to the 'Fishing Creek Place' and the 'Parish Place' had reverted to the heirs of Mary Hemphill, as that is a question of law for determination upon the trial of the legal issues in this case. It may be remarked, however, that if the reversion of these lands, after the death of Susan C. Kell without issue, was in Mary Hemphill and was undevised under her will, the same would have descended to Susan C. Kell, who was the sole heir of Mary Hemphill at the time of her death, according to concessions as to this fact made at the hearing. As already stated, however, these are legal issues of title for adjudication upon the trial herein upon the law side of the Court, and no opinion can now be properly expressed thereupon.

"As to the matter referred to in the seventh exception, it is considered that the question as to who was in the actual possession of the Fishing Creek Place and the Parish Place at the time of the commencement of this action is immaterial to the determination of any equitable issue herein. As to whether it is material upon the trial of any issue as to the legal title is a question for the Court before which that question may arise.

"Coming now to the errors alleged in the conclusions as to matter of law set out in the eighth exception, there can be no doubt that the referee was right in holding that in so far as the plaintiff is seeking to set up any title to the Fishing Creek Place through and under Susan C. Kell, the plaintiff is estopped by the warranty in the deed from Susan C. Kell to J. H. McMurray, of date November 20th, 1880, from setting up any title in herself to the Fishing Creek Place claimed to have been derived by her as heir of Susan C. Kell, whether such title was held by Susan C. Kell at the date of the execution of the deed or subsequently acquired.

This will not, of course, prevent the plaintiff from establishing at the trial of the legal issues herein any independent title which she may have to said land, not derived through Susan C. Kell subsequent to the execution of said deed. As to the remaining questions made by this exception, they are concluded by what has been said in disposing of plaintiff's fourth exception.

"As it has already been held that the claim of Susan C. Kell against the estate of Mary Hemphill, on account of the legacy referred to in the ninth exception, the same being the claim established by the decree already mentioned, was barred by the statute of limitations and stale by lapse of time, it follows that this exception cannot be sustained.

"With reference to the 11th and 12th exceptions, it is sufficient to say that it is shown by the evidence and conceded by the plaintiff that the defendants (excepting Eunice R. Cloud and Susan A. Boylston) are the owners of a two-thirds interest in the Fishing Creek and the Parish Places, and they are, therefore, entitled to two-thirds the rents thereof. In the 10th paragraph of the complaint, the plaintiff avers that a two-thirds interest in the Parish Place is the defendants (other than Susan A. Boylston and Eunice R. Cloud), and in the 11th paragraph she alleges that the defendants, Susan A. Boylston and Eunice R. Cloud, are the owners of a two-thirds interest in the Fishing Creek Place, which interest the evidence shows has been conveyed by Susan A. Boylston and Eunice R. Cloud to their codefendants herein. It thus appears that the plaintiff claims only a one-third interest in each of these two places and in the rents and profits of the same, and, as has already been held, the question as to whether the plaintiff owns such one-third interest is a legal issue for determination on trial by jury. The conclusion of the referee, therefore, in so far as concerns the title to this remaining undivided one-third interest in these two tracts of land and as to the accountability of plaintiff for the rents and profits of such one-third interest,

being dependent upon the issue as to the legal title to the said one-third interest, cannot be sustained for the reason that this question of title, being a legal issue, is triable by the Court on its law side and not by the referee under a submission of the equitable issues. So far, therefore, as the referee undertakes to determine that the title to anything more than a two-thirds interest in the Fishing Creek and Parish Places is in the defendants (the Kells) and so far as the referee undertakes to adjudge that the plaintiff is accountable to the defendants (the Kells) for any more than the two-thirds part of the rents and profits of said two places received by plaintiff, the conclusions of the referee are overruled; the question as to the legal title of the plaintiff to a one undivided third interest in said two tracts and as to her consequent legal title to and ownership of one undivided third interest in the rents and profits thereof, since the death of the said Susan C. Kell, being reserved for determination by the Court upon the trial of the legal issues herein.

"The remaining questions presented by the 10th and 13th to the 20th exceptions, inclusive, embrace the chief issues in this case and those to which almost the entire argument at the hearing was directed.

"These exceptions raise substantially three questions, that is to say:

1st. "Whether there was error by the referee in the finding and conclusion that, on the 27th day of October, 1902 the said Susan C. Kell was mentally competent to understand and did comprehend the nature, force and effect of her act in signing the deed, dated on that day, conveying to Dr. B. E. Kell the Home Place, the Rocky Creek Place and the Parish Place; and that said deed was duly executed and is a valid deed vesting the fee simple title to the said lands in the grantee therein named. ·

2d. "Whether there was error by the referee in the finding and conclusion that said deed was voluntarily, willingly

and freely executed by the said grantor, Susan C. Kell, and was not procured or induced by any undue influence, fraud, cunning, duress or artifice, and that there were no circumstances attending or surrounding its execution to raise a presumption of fraud or undue influence; and that said deed is, therefore, valid.

3d. "Whether there was error by the referee in the finding and conclusion that any presumption of fraud or undue influence, raised by the relationship existing between the grantor and grantee of this deed, has been rebutted by the evidence, and that the said deed was supported by a good and valuable consideration, and is, therefore, valid.

"The plaintiff's contentions are, first, that at the date of the signing of this deed, the said Susan C. Kell was insane, or at least, mentally incapable in law of executing the same, and second, that, even if she were not then so insane or mentally incapacitated to execute the deed, yet the execution thereof was procured by fraud or undue influence on the part of the grantee.

"Considering first the question as to the mental capacity of the grantor, the rule of law with reference to this matter may be stated in general terms to be that, while the mental incapacity which will render one unable to make a contract or a valid gift, need not be so great as entirely to dethrone the reasoning powers, there must be at the time of the act or contract such insanity or mental weakness or unsoundness as amounts to an incapacity or occasions an inability to understand or comprehend the subject of the contract or act and its nature and probable consequences, in order to render the act or contract void in law. 22 Cyc. 1206; *Rippey* v. *Grant,* 4 Iredell 443; *Miller* v. *Craig,* 36 Ill. 109; *Dennett* v. *Dennett,* 44 N. H. 541; 84 Am. Dec. 97; *Hay* v. *Miller,* 66 N. W. Rep. 1115; *Dewey* v. *Algire,* 40 Am. St. Rep. 468; *West* v. *Douglass,* 145 Ill. 111; *Argo* v. *Coffin,* 142 Ill. 368; 34 Am. St. Reps. 86; *Mann* v. *Bank,* 86 Fed. Reps. 51.

"In order to render a deed void upon the ground of the mental incapacity of the grantor, it must appear that there was on his or her part such mental infirmity as to render him or her incapable of understanding the nature of the act. The test is not whether the grantor's mental powers were impaired, but whether, at the very time of the execution of the deed, he had sufficient capacity to understand in a reasonable manner the nature and effect of the act which he was performing. Mere infirmity of mind or body, not amounting to an incapacity to understand the nature and consequence of the act done, will not render a person incapable of executing a valid deed. Nor will monomania or delusion existing in the mind of the grantor affect the validity of a deed, unless it be such as to actually influence his mind in the very transaction in question by rendering him incapable of appreciating the true nature and effect of the particular act in controversy. 13 Cyc. 573, 574; 16 A. & E. Enc. L. 624; 9 Id. 119, 123; 18 A. & E. Enc. L. 624 (2d ed.); Id. 123; *Concord* v. *Rumsey,* 45 N. H. 428; *Teeter* v. *Teeter,* 52 S. E. (W. Va.) 782; *Rippey* v. *Grant,* 4 Iredell 443; *Hovey* v. *Hobson,* 55 Me. 282; *Buckey* v. *Buckey,* 38 W. Va. 168; *Woodville* v. *Woodville,* 60 S. E. 141; *Dennett* v. *Dennett,* 44 N. H. 521.

"As is said in *Rowland* v. *Sullivan,* 4 DeS. 520, there must be made to appear 'some incompetency of mind, showing an incapacity at the moment of executing the deed or will, or some imposition practiced upon the testator or donor must be proved, to authorize the Court to exercise the high power of setting aside deeds or wills regularly executed.'

"Considering the question as to the capacity of Susan C. Kell to make the deed here in question in the light of the principles adjudicated by these authorities, does it appear here that, at the moment of the signing of this deed on the 27th day of October, 1902, she was mentally competent to understand and did in fact comprehend the purpose and effect of her act in singing this deed?

"It is shown by the evidence that, at the date mentioned, the grantor in this deed, an aged lady of intelligence and refinement, about 81 or 82 years old, twice widowed and having lost her last husband some months previously, having no children nor any who could be called near and intimate relatives, was living in the home of those who are the witnesses to the deed here in question. It further appears that the grantee of the deed, the nephew of her last husband and a physician of high character and repute, who had long bestowed upon her his most devoted care and attention, occupied that place in her heart and affections which would naturally have been held by a beloved son, had she been so fortunate as to possess a child by whom she might have been guarded and cherished in her declining years.

"It is beyond question that, at this time, Mrs. Susan C. Kell was not of strong mentality, was feeble in body and almost deprived of her eyesight, was subject at times to that forgetfulness and loss of memory which is frequently found to occur in the case of very aged persons, and was occasionally visited by certain delusions which recurred at more or less frequent intervals. The only particular delusion, however, which could strictly be characterized as recurrent, appears to have been the idea which at intervals took possession of her mind, that her parents were still living and that they might be found at a certain more or less definite place. But this belief was temporary and occasional, it was not persistent, and it readily yielded to the reminder that her parents were long since dead.

"According to the learned opinions of the experts, it further appears that Mrs. Kell was at intervals afflicted with a 'loss of orientation,' which is to say, that at such times she imagined herself to be at a different place, going to a different direction from that which was the fact. But this, also, is clearly shown to have been only occasional and temporary, not often recurring nor persisting, but easily yielding

14—90

to an acceptance of the truth of the facts when called to her attention.

"Much learning has been displayed in this case by the medical experts in the discussion of the question as to whether, during the latter years of her life, Mrs. Kell was suffering from senile dementia or merely from neurasthenia. The testimony upon these points by the doctors examined as experts, some of whom had little or no acquaintance with her, was based chiefly upon hypothetical inquiries as to what mental condition was indicated by particular acts or remarks attributed to Mrs. Kell upon various isolated and disconnected occasions. The opinions of some of these learned physicians are apparently based upon an aggregation of specific acts performed and words spoken by Mrs. Kell upon more or less widely separated occasions, assembled from the testimony of various witnesses and read by or recounted to the experts with a view of their predicating thereupon a theory as to her general mental condition and power of mind.

"After a very careful reading and consideration of their testimony, the conclusions of these experts appear to be based so largely upon conjecture as to the possible influence and effect of various events and occurrences in her life and as to the inference to be drawn from disconnected and in some instances unascertained acts and facts, in large measure remote from the time of the execution of the deed, as to render their evidence as to Mrs. Kell's probable capacity at that time of little if any value to the judicial mind. One expert concludes, although with some apparent doubt and hesitation, that, when last seen by him in 1898, Mrs. Kell was probably incapacitated by senile dementia from attending to business; while upon a hypothetical statement of practically the same facts and by a substantially identical method of reasoning, another unquestionably learned expert comes to an opposite conclusion as to her mental capacity in 1902, his opinion being without support of any personal

knowledge whatever as to the facts upon which it was based. While there is indubitable proof that, at times, Mrs. Kell suffered from aphasia and amnesia (to make use of the terms employed by the medical experts), yet those afflictions cannot be considered as necessarily establishing incapacity to convey property, as otherwise the writer of this opinion, in common with many others generally considered of sufficient mental power for the ordinary transaction of business, would be disqualified from disposing of property if the occasional exhibition of such comparatively trifling defects could be regarded as proof of mental incapacity. There is no satisfactory evidence that Mrs. Kell in 1902 was suffering from any such degree of mental impairment as is denoted by the term senile dementia, although some of the experts seem to imply or assert that such was the case. As has already been remarked, however, the conclusions of these experts seem to have so little foundation of relevant facts to support them and appear to be based so largely upon mere conjecture, and their opinions are so irreconcilable and at variance the one with the other, as to render them of no practical service in arriving at the truth as to Mrs. Kell's mental capacity at the date in controversy.

"Dismissing, therefore, the opinions and conclusions of the experts as offering no substantial aid in the determination of the question under consideration, and proceeding to an examination of the testimony of those witnesses who were well acquainted and who were frequently associated with Mrs Kell, we find that while some of them testify to occasional acts and speeches of that lady (as already mentioned), tending to indicate that she was at times afflicted with aphasia, amnesia and a delusive belief that her father and mother were still living, and perhaps that she was laboring more or less under the malady denoted by the term neurasthenia, yet there is found in the evidence no ground for supposing that these temporary and occasionally recur-

rent conditions had to any material extent impaired her
general capacity to comprehend the nature and probable
results of her act in signing the deed here in question.   Nor
is there any evidence that, on the day of the execution of
the deed, she was laboring in any degree whatever under
the burden either of aphasia, amnesia, delusion, neurasthe-
nia or senile dementia.   On the contrary, the proof is full
and the testimony without conflict that she was then in the
complete enjoyment of her ordinary capacity for under-
standing such a transaction, that she did in fact understand
the nature of the act performed in signing the deed in ques-
tion, and that she comprehended the effect of her signature
to that paper.   This is the testimony of those witnesses pro-
vided by the requirements of law for the very purpose of
attesting the capacity of the grantor, as well as the manual
act of her signature, and it is also the testimony of others
present at or near the time of such signing, and these wit-
nesses alone, perhaps of all those examined in the cause, are
qualified to speak positively as to her mental condition at
the very moment in question.   To the witnesses to this deed
and to the others present at or about the time of its execu-
tion the referee pays the tribute of saying, upon his own
knowledge of their characters, that no consideration what-
ever would induce any of them knowingly to make a mis-
statement of fact or consciously to engage in a misrepre-
sentation of the truth.   Their testimony, therefore, is
entitled to the highest credence and is alone sufficient to
sustain the referee's conclusion upon the question against
the mere opinion or suggestion of other witnesses who
saw her occasionally at previous or subsequent times when,
in their opinion, she was incapable of understanding the
nature and effect of such a transaction.

"When, in addition to this direct testimony as to her
capacity, given by the members of the Brown family with
whom she resided, there is considered the evidence as to her
general understanding and powers of mind as contained in

the depositions of such men as Dr. DeK. Wylie, who had been her family physician and who may be said to have known her intimately, Mr. J. McC. Caldwell, Mr. W. C. Garrison, the two McCroreys, and other neighbors and friends, who saw her frequently near the time in question, it must be concluded that her general capacity to execute the deed has been established, notwithstanding the dissenting opinions of others who saw her at more or less infrequent intervals. It may be remarked, further, that Mrs. Mary E. Brown, whose high character is vouched for by the referee, testifies that, upon one or more occasions after the execution of this deed, Mrs. Kell referred in conversation to the fact that she had conveyed all her property to Dr. B. E. Kell by this deed and expresses satisfaction with her action in so doing; and Miss Bessie Brown, having a similar endorsement by the referee, testifies to substantially the same declarations made by Mrs. Kell after the execution of the deed.

"While it is quite true that a number of credible witnesses deposed,to conditions of mind and memory exhibited and to acts done by Mrs. Kell on particular occasions, evidencing some degree of irrationality on her part at such times, which induced these witnesses to believe that she was then mentally. incapacitated for the transaction of business; yet the testimony of those best acquainted with her and best qualified to judge as to her general capacity, and especially the testimony as to her mental condition while living at the Browns, and particularly at the time of the execution of this deed, is convincing and conclusive as to her capacity to understand and as to the fact that she did comprehend the nature and effect of her act in signing the deed of October 27th, 1902. Mere temporary aberrations of mind, resulting from old age and ill health, existing during brief periods of time upon days more or less remote from the date in question, cannot be considered as necessarily so evidencing her incapacity at the time of the execution of the deed as to outweigh the uncontradicted and credible testimony of reli-

able witnesses who vouch for her capacity and understanding of her act at the very moment of the making and delivery of the deed.

"Upon a consideration of the entire testimony in the case, and after careful attention to the learned and exhaustive arguments of counsel, both upon the law and the facts, the conclusion has been unhesitatingly reached that the preponderance of the evidence establishes the fact that the conveyance here in controversy is the act and deed of one who was then fully capable of disposing of her property as she might see fit.

"It remains to consider the question as to whether there has been shown such pressure of inducement exerted upon the grantor in this deed, in procuring the execution thereof, as would amount to undue influence, or any such advantage taken of her in inducing the making thereof, as would amount to fraud, so as to require its cancellation by a court of equity.

"The principles of law applicable to the question of undue influence are well settled and may be thus stated in general terms:

"Where a deed is procured by undue influence exerted upon the grantor, it will be set aside by a court of equity upon a proper and timely application on the part of the person injured or aggrieved thereby; but, in order to avoid the deed upon this ground, there must be shown such an influence exerted upon the grantor as to overbear her will and to make the act of execution not the carrying out of a real purpose or intention of the grantor, but the mere mechanical performance by her of the wish and design of some other person. Neither fair argument, nor mere suggestion, nor even persuasion, unaccompanied by other circumstances to show a substitution of the will or purpose of some other person for that of the grantor, will amount to undue influence. In order to make it undue, it must appear that the influence exerted was such

as to overcome or destroy the free will of the grantor and to make the deed as executed the expression not of his purpose, but that of some other person.    13 Cyc. 285; 9 Cyc. 455; *Revels* v. *Revels,* 64 S. C. 272, and authorities there cited; *Conley* v. *Naylor,* 118 U. S. 127.

"But 'the line between due and undue influence, when drawn, must be with full recognition of the liberty due every true owner to obey the voice of justice, the dictates of friendship, of gratitude and of benevolence, as well as the claims of kindred, and when not hindered by personal incapacity, or particular regulations, to dispose of his own property according to his own free choice.' *Wallace* v. *Harris,* 32 Mich. 380.

"It is further an established principle of equity, well founded in right reason, that the acts and contracts of persons who are of weak understanding and who are thereby liable to imposition, and also all contracts or gifts between persons standing in confidential relations towards each other, will be closely scrutinized by the Courts to discover whether or not any undue influence was exerted or any confidence was betrayed to the prejudice of the weaker party or of the one reposing such trust and confidence.   27 A. & E. Enc. L., p. 456; 29 Id. (2d ed.), p. 102; *Gaston* v. *Bennett,* 30 S. C. 456; *Allore* v. *Jewell,* 94 U. S. 506; *Wille* v. *Wille,* 57 S. C. 413; *Bank* v. *Hendrix,* 24 S. C. 1; 9 A. & E. Enc. L. 124; *Martin* v. *Tague,* 2 Sp. L. 268; *Woodward* v. *James,* 3 Strob. L. 552; *Farr* v. *O'Neall,* 1 Rich. L. 80; *Pressly* v. *Kemp,* 16 S. C. 344; *Price* v. *R. R.,* 38 S. C. 215.

"Undue influence may bé said to consist in any influence which is so far operative as to destroy free agency, so as to compel the person doing the act in question to do the same against his will.   It is not material how such control was exerted, whether by physical force, threats, importunities or any other species of mental or physical coercion, provided only it was so exerted as to destroy free agency and to

make the act done not a true expression of the will of the person doing it, but in truth a carrying out of the purposes of some other person against that will. But the undue influence is to be proved and not to be presumed, unless the relation in which the parties stood with reference to each other is such as to raise a presumption of its existence. Yet even where such a presumption arises, it is rebutted by evidence showing that everything between the parties was fair, open, voluntary and well understood. See 29 A. & E. Enc. L. (2d ed.) 102, 105, 119, 122; *Means* v. *Means,* 5 Strob. 167.

"Applying the principles stated to the evidence in the case at bar, we find that the grantor in the deed hereunder consideration was a feeble old lady, past her four-score years of life, her mind and memory to some extent weakened and impaired by the troubles and afflictions of her previous life, and by the burdens of the years resting upon her, entertaining at times delusive momentary beliefs as to the continuing existence in her life of her long-dead parents and temporary beliefs at variance with facts as to then existing weather conditions and as to locality of places. It appears that she had none then standing towards her in the relation of her kindred or dear friends, excepting only the grantee in this deed, who was not her blood, but had long been holding the place of a devoted son, having laid aside a promising career in life in order to bestow upon her the skilled attention which his knowledge as a physician enabled him to give. It is shown by the evidence that the grantor was weak in body and doubtless to some extent enfeebled in her general mental powers, but that at the very moment of the execution of the deed she was not laboring under any delusion of mind and was in fact engaged in the carrying out of a long-cherished purpose to dispose of her property as to insure its devolution upon her grantee. It is true that, at or about the time of the signing of the paper in question, she expressed sentiments of confidence in the

belief that the grantee would continue to care for her during the remaindr of her life, and it cannot be doubted that she executed the deed in the faith that he would not permit her to suffer by reason of her act. If he had failed to give her support, aid and maintenance, the circumstances and relations of the parties were such as would well have warranted a court of equity in imposing upon the grantee the duty of providing for her support and comfort during the remainder of her life, at her instance and upon her application. But it does not appear that there was any abuse of that trust and confidence nor is there any evidence of a failure by him to discharge any duty in that particular.

"The testimony of the subscribing witnesses and of those present at the time of the signing by the donor is unanimous to the effect that she was then *compos mentis,* that she appreciated and understood the force and effect of her act, that she was not hoodwinked or deceived as to the nature of the instrument, and that she acted entirely of her own volition, although upon the suggestion of the grantee in the execution of the instrument. The voluminous mass of the evidence in this case has been searched in vain to discover any testimony of undue influence exerted by the grantee or by any other person, either before or at the time of the execution of the deed, in order to induce the making thereof. There is not the slightest evidence of even argument or persuasion employed to that end, and the testimony tends to show, and in my opinion does establish, the fact that the grantor therein had long entertained a fixed purpose to bestow the lands in question upon the grantee as ultimate owner.

"It it be the fact, as I think it is, that the relation of the parties to this transaction and the mental weakness and dependence of the grantor upon the grantee were such as to impose upon those claiming under the latter the burden of showing that no fraud was practiced nor undue influence exerted by or on behalf of the beneficiary under this gift,

that there was no *suppressio veri* nor *suggestio falsi* operating as an inducement thereto, it is my opinion after a careful examination of the entire record, that this has been affirmatively shown, and that it appears from the evidence that the conveyance was the voluntary act and deed of Susan C. Kell, was willingly executed by her in pursuance of a long cherished intention, was not induced by any suppression or misrepresentation of facts, and that there was no fraud upon the part of the grantee thereof nor abuse of the confidential relations existing between the said grantor and grantee.

"The evidence shows that the act of signing was performed not only understandingly and without reluctance, but also with a desire and purpose on the part of the donor to dispose of her property to the donee named in the deed and for his own ultimate benefit. When the effect of her act was mentioned to her subsequently to such execution of the deed, she expressed satisfaction with her act in so disposing of her property and a continued understanding of the purpose and effect of what she had done. She lived for nearly two months thereafter, and so far as the evidence discloses, although the fact of her having so disposed of practically her entire property was mentioned in her presence and in the absence of the donee, she never at any time, so far as appears, gave expression to any other feeling than that of satisfaction with the deed as effectuating her voluntary purpose and intention. If the transaction had been regarded at the time by the grantee as a business transaction, whereby she was conveying the property to the grantee in consideration of past services alone, or if there were evidence going to show that she viewed it in the light of a commercial transaction, then the question sought to be made as to the adequacy of the consideration mentioned in the deed would be a matter of serious importance. But as it was evidently understood by her as being a deed of gift, with but slight, if any, reference to pecuniary obligations

existing between the parties, the transaction is to be considered as purely a matter of gift and not of bargain and sale. So considering it, I am of the opinion that the validity of this deed must be sustained, and it is accordingly so adjudged.

"This disposes of the exceptions of the plaintiff to the report of the referee, all of which are overruled except in so far as the same have hereinbefore been sustained.

"As to the first exception by the defendants, relating as it does to a question of evidence, as it was not discussed or pressed in any way at the hearing, it does not appear to require especial consideration in view of the conclusions already reached. It may be remarked, however, that if there was any error as is therein alleged it appears to have been harmless error.

"In so far as the costs and disbursements of this cause in equity are concerned, in view of the fact that the burden of proof was properly upon the defendants here to show that no advantage had been taken of the confidential relations existing between the grantor and grantee of the deed in question, and especially in view of the fact that this deed does not appear to ever have been spread upon the records of the proper office, I overrule the exception by the defendants as to the matter of the payment of such costs and disbursements and direct the payment of the same in accordance with the recommendations of the referee.

"As to the conclusion of law by the referee as to the rents and profits collected by plaintiff from the Fishing Creek and Parish Places, the liability of the plaintiff to the defendants for such rents and profits to the extent of two-thirds thereof, and interest from the time of receiving the same, results from the conclusions already reached, but the liability for the remaining one-third is yet to be determined by the result of the trial of the legal issues herein.

"Under the views already stated, the recommendation by the referee as to a dismissal of the complaint must be dis-

approved, and the cause must be retained for trial by jury of the legal issues of fact herein, and also for the purpose of stating the accounts as to the rents and profits. Leave is granted for an application to be hereafter made to the Court, or to any Circuit Judge having jurisdiction at chambers, after notice, for a recommittal of the report for such further accounting by any of the parties for the rents and profits of any of the lands in question, as may be necessary and in accordance with the conclusions of this decree, or may be rendered proper in the further progress of the cause, and for such statement of the accounts for rents and profits already found and of the interest chargeable thereupon as may be conformable to the conclusions of this decree and requisite to a final judgment herein as to said matters of accounting."

The plaintiff appeals upon the following grounds:

(1) "That the Honorable the special Judge erred in not allowing the plaintiff's motion, made at the trial of the said cause before him, to amend the complaint so as to conform the same to the proof in the cause, by striking out the description of the 'Parish Place,' in the first paragraph of the complaint, and by inserting the same after the description of the 'Fishing Creek Place,' in the eleventh paragraph of the complaint; the effect of such amendment being to change the allegations of the complaint as to this Parish Place, so as to allege that Mrs. Susan C. Kell had a life estate only in the same, and that at her death the same passed to the plaintiff and her sisters, the defendants, Susan A. Bolyston and Eunice R. Cloud, as tenants in common, and as such they are each entitled to one-third (1-3) undivided interest thereof in fee, instead of the allegation that Mrs. Susan C. Kell died seized and possessed of the same, so as to conform the same to the proof as developed in the testimony and trial of the cause; whereas, the same should have been allowed for the reasons stated.

(2) "That he erred in overruling plaintiff's fourth exception to the report of the referee; and in so doing in holding: 'The evidence showed merely a purchase of this land by B. E. Kell, Sr., from J. H. McMurray, a payment by him of part of the purchase money in cash and an assumption of liability for the payment of a certain undesignated mortgage debt against the said land conveyed to him. There is no evidence whatever that any money belonging to Susan C. Kell was used in the purchase of this land, or applied in the payment of the purchase money thereof.'

"And in further holding: That the fact that the mortgage debt was owing to Susan C. Kell would only amount to 'an acknowledgment of liability for the payment of any balance that might be due thereon, but would not constitute a using of the money of Susan C. Kell in the purchase of the land. Under such circumstances there is nothing. upon which a resulting trust can be based, as even the assuming of the payment of a mortgage debt due to the wife of the grantee would not operate to raise a resulting trust in land, but could occasion merely a liability by B. E. Kell, Sr., for the payment to her of the mortgage debt.'

"Whereas, he should have sustained the said exception and held: That B. E. Kell, Sr., the purchaser of the land, was the husband, agent and trustee of Susan C. Kell, the mortgagee, and owner of the mortgage upon the said land referred to, and that this mortgage has never been paid or satisfied, and that the amount due upon the said mortgage constituted fiduciary funds used by the trustee in the purchase of property in his own name, and which he has not paid, and that Mrs. Kell had, therefore, an interest in the said lands, by way of resulting trust, to the extent of the funds so belonging to her used in the purchase of the land from McMurray by B. E. Kell, and that equity will not permit a trustee to employ the trust funds, in what shape soever they may be, for his own benefit and profit and to the loss of the *cestui que trust*.

(3) "That he erred in overruling plaintiff's eighth exception to the referee's report, and holding: 'There can be no doubt that the referee was right in holding that, in so far as the plaintiff is seeking to set up any title to the Fishing Creek Place through and under Susan C. Kell, the plaintiff is estopped by the warranty in the deed from Susan C. Kell to J. H. McMurray, of the date of November 20, 1880, from setting up any title in herself to the Fishing Creek Place, claimed to have been derived by her as heir of Susan C. Kell, whether such title was held by Susan C. Kell at the date of the execution of the deed or subsequently acquired.'

"Whereas, he should have held: That B. E. Kell was the husband, agent and trustee of Mrs. Kell, at the time and in the very transaction by which he took the deed from McMurray, and being fully aware of the limited estate which McMurray had taken under his deed from Mrs. Kell, and of the mortgage and amount due thereon, given by McMurray as security for the unpaid portion of the purchase price of the place, which mortgage, representing funds of Mrs. Kell, was used in the purchase of the said lands by the trustee, B. E. Kell, from McMurray, and that the said B. E. Kell, and those claiming under him as devisees are estopped from denying that Mrs. Kell, or her heirs at law, are entitled to the proportion of the land represented by the amount of the mortgage debt so used by her husband, agent and trustee, in the purchase of the lands for himself, and the warranty in her deed to McMurray cannot bar Mrs. Kell, or her representatives and heirs at law, from asserting this interest in the said lands, and as against any after-acquired interest of Mrs. Kell therein that would pass by said warranty to McMurray and his assigns.

(4) "That he erred in overruling plaintiff's tenth exception to the referee's report, and in holding: 'That on the 27th day of October, 1902, the said Susan C. Kell was mentally competent to understand and did comprehend, the nature, force and effect of her act in signing the deed dated

on that day, conveying to Dr. B. E. Kell the "Home Place," the "Rocky Creek Place" and the "Parish Place;" and that the said deed was duly executed and is a valid deed, vesting the fee simple title to the said lands in the grantee therein named.'

"And in further holding: 'That the preponderance of the evidence establishes the fact that the conveyance here in controversy is the act and deed of one who was then fully capable of disposing of her property as she might see fit.'

"Whereas, he should have held: That at the time of the execution of said deed Susan C. Kell was mentally incapable of executing the same, and of knowing the force and effect thereof, and physically unable to sign the same unaided, and that she did not understand the force and effect of the same; and he should have held, further:

(b) "That even though the said deed be valid, as to the Parish Place, it could only convey to Dr. Kell, the grantee, the interest of Mrs. Kell, the grantor, therein, to-wit: her life estate, as held under the will of Mrs. Jane Hemphill, and that upon her death the estate so conveyed ceased and determined, and that the defendants, the grantees of Dr. Kell, have no interest therein save such as was conveyed to them after Mrs. Kell's death by plaintiff's sisters, Miss Eunice R. Cloud and Mrs. S. A. Boylston, who at the death of Mrs. Kell, the life tenant, were the heirs at law of Miss Hemphill, as well as of Mrs. Kell.

(5) "That he erred in holding: 'There is no satisfactory evidence that Mrs. Kell, in 1902, was suffering from any such degree of mental impairment as is denoted by the term senile dementia, although some of the experts seem to imply or assert that such was the case.'

"And in further holding: '* * * that perhaps she was laboring more or less under the malady denoted by the term neurasthenia.'

"Whereas, he should have held: That the clear weight of the undisputed testimony of the medical witnesses, who had

seen and treated Mrs. Kell during the latter part of her life, was that she was then suffering from senile dementia, and had been for a long time, and that said disease manifests itself in its earliest stages in more violence and excitability of body and mind, which affects the physical conditions and general health, but as the disease progresses the mind becomes more affected, and its blood supply is decreased, and it becomes less active and more passive, and the patient then becomes more quiet and less violent, and that finally the mind is entirely lost, while the health of body improves; and that just such conditions were shown to exist in the case of Mrs. Kell.

(6) "That he erred in overruling plaintiff's fourteenth exception to the report of the referee, and in holding: 'The voluminous mass of the evidence in this case has been searched in vain to discover any testimony of undue influence exerted by the grantee, or by any other person, either before or at the time of the execution of this deed, in order to induce the making thereof. There is not the slightest evidence of even argument or persuasion employed to that end, and the testimony tends to show, and in my opinion does establish, the fact that the grantor therein had long entertained a fixed purpose to bestow the lands in question upon the grantee as ultimate owner.'

"Whereas, he should have held: That from all the facts and circumstances surrounding the execution of the deed and the relation of the parties, as shown by the evidence, that actual undue influence, as well as constructive or presumptive undue influence, from fiduciary relations of the parties, was clearly shown, and the deed should have been declared null and void and set aside.

(7) "That he erred in overruling plaintiff's thirteenth exception to the referee's report, and in holding: 'It is true that, at or about the time of the signing of the paper in question, she expressed sentiments of confidence in the belief that the grantee would continue to care for her dur-

ing the remainder of her life, and it cannot be doubted that she executed the deed in the faith that he would not permit her to suffer by reason of her act. If he had failed to give. her support, aid and maintenance, the circumstances and. relations of the parties were such as would well have warranted a court of equity in imposing upon the grantee the duty of providing for her support and comfort during the remainder of her life, at her instance and upon her application. But it does not appear that there was any abuse of that trust and confidence, nor is there any evidence of a failure by him to discharge any duty in that particular.'

"And in further holding, in effect, that because the grantee never neglected or failed to provide for Mrs. Kell, the grantor, and carried out the intention of the arrangement, which he holds, under the circumstances and conditions stated, to have been made between them, that there could be no undue influence; the error being: That it is not. necessary, in order to avoid a deed for undue influence, to show, in addition to actual undue influence, or undue influence from fiduciary relation of the parties, that the grantee so procuring the execution of such deed failed to support or neglected or abandoned the grantor; whereas, he should have held: That if the deed was procured by undue influence, actual or constructive, the court of equity will set it aside as against public policy, irrespective of whether or not the grantee in possession of the estate so conveyed provides for the grantor, or carries out the terms of the arrangement. that grantor had been induced to make by reason of such undue influence.

(8) "Having held that the highest degree of confidence and trust existed in the relations between the grantor and the · grantee, the latter being the physician and medical· attendant of the former, who was an old lady of eighty-odd years old, of weak mind and memory, and subject to various delusions, and accustomed to rely upon the advice and direction of the grantee, and being, at the time of the execu-

tion of the deed, nearly, if not quite, blind, and that the deed was without consideration, in the nature of a gift of all her valuable estate, he erred in further holding: That the validity of this deed must be sustained, and in so adjudging; whereas, he should have held: That from the said facts and circumstances so found to exist at the time of the said conveyance, that imposition or undue influence will be implied in law.

(9) "That having held that the relations of the parties and the inadequacy of the price paid were such as in law to raise the presumption of undue influence, he erred in holding that such presumption can be rebutted by proof of the absence of actual fraud, persuasion, argument or duress; whereas, he should have held that the only way to rebut such presumption of undue influence from the relationship of the parties is by clear proof; that the relation of the parties had no bearing or influence upon the transaction; that they dealt at arm's length, as strangers, in the transaction, and that the grantee had not been actively concerned in the preparation and execution of the deed, and that the grantor had the benefit of independent, disinterested advice, and that the conveyance was for adequate valuable consideration, or considered as a gift, pure and simple, that the gift was such an one as the court of equity would permit to have been made out of a trust estate owned by Mrs. Kell, by her trustee, upon application, to a relative or friend for whom she entertained an affection; none of which have been shown, or attempted to have been shown, in this case.

(10) "That he erred in not holding that the said deed was obtained without adequate consideration, and while the grantor was mentally incapable of executing the same, and of knowing the force and effect thereof, while she was under duress, and under the care of parties employed by the grantee, and by means of undue influence, while the relations between her and the grantee were of the very

closest fiduciary and confidential nature, and the day after the grantee had informed her of her husband's death, and without the opportunity of independent advice, and upon the solicitation of the grantee, who came with the deed prepared for her to sign; and that the same is fraudulent, null and void, and should be set aside and cancelled by the decree of this Court.

(11) "That he erred in not holding that plaintiff was and is entitled to one-third interest in all the lands described in the complaint, and in failing to decree partition thereof."

*Messrs. Halcott P. Green, Henry & McLure* and *A. L. Gaston,* for appellant.

*Mr. Green* cites: *Transactions between husband and wife should be carefully scrutinized:* 70 S. C. 240; 43 S. C. 476; 55 S. C. 290; 56 S. C. 193. *Mental capacity necessary to make a valid deed:* 50 S. C. 105; 7 Rich. 479; 18 Ency. 624; 9 Ency. 122; 44 N. H. 531. *The deed was obtained by undue influence:* 30 S. C. 468; 12 S. & M. 369; 71 Mo. 651; 79 Mo. 147; 104 Mo. 158; 6 L. R. A. (N. S.) 202. *And should be set aside whether the grantee carried out his verbal promise to support grantee or not:* 24 S. C. 1; 48 Mo. 497. *Undue influence will be inferred from the relation of the parties:* 27 Ency. 454, 456; 2 Pom. Eq. Jur., sec. 955; 94 U. S. 506; 113 U. S. 89; 101 U. S. 133; 24 S. C. 1; 29 Ency. 124-9; 5 Rich. Eq. 470; 31 Am. R. 342; 44 N. J. Eq. 372; 69 L. R. A. 393; 61 S. C. 501; 87 S. C. 1; 57 S. C. 413; 30 S. C. 473; 61 S. C. 501. *If consideration is inadequate, deed should be set aside:* 87 S. C. 1; 5 Rich. Eq. 450; 68 Mich. 232; 130 Cal. 352; 24 S. C. 1; 112 Ga. 487; 157 Mo. 402. *So where there is lack of independent advise:* 47 N. J Eq. 122; 32 Minn. 25; 72 Mo. 669; 8 L. R. A. 261; 13 Cyc. 589. *And where transaction is secret and deed not recorded:* 29 Ency. 113-4; 53 Ala. 89.

*Messrs. Henry & McLure* cite: *Greater intelligence required to make a deed than a will:* 50 S. C. 106; 65 S. C. 558. *When undue influence presumed:* 57 S. C. 417. *Unconscionable low price:* 4 Dess. 697. *Weak mind:* 50 S. S. 474; 24 S. C. 12; 1 Story Eq. Jur. 221, 235, 238; *Wharton* v. *Stiles,* Med. Jur. 77.

*Messrs. J. H. Marion, Glenn & McFadden* and *R. B. Caldwell,* contra.

*Mr. Marion* cites: *Plaintiff has no interest in Fishing Creek Place by way of resulting trust:* 52 S. C. 288; 15 Ency. 1142-6, 1150-65; 46 S. C. 193; 51 S. C. 37; 52 S. C. 472; 32 S. C. 590, 595; 27 S. C. 39; 23 S. C. 257; 19 S. C. 26; 65 S. C. 102; 1 Strob. Eq. 103; 4 DeS. 516. *Plaintiff is estopped by McMurray deed:* 11 Ency. 403, 405, 415; 16 Cyc. 689, 710, 716, 718; 35 S. C. 536; 21 S. C. 55, 68; 19 S. C. 9; 17 S. C. 592; 3 McC. 411; 5 Rich. Eq. 434; 1 Rich. Eq. 71; 38 S. C. 393. *Relation of parent and child overturns presumption of undue influence from confidential relationship:* 44 N. E. 9; 50 N. E. 389; 64 S. C. 256.

*Mr. R. B. Caldwell* cites: *No abuse of discretion in denying motion to amend:* 50 S. C. 459; 51 S. C. 412. *What facts establish resulting trust:* 52 S. C. 391. *Plaintiff is estopped by warranty in McMurray deed:* 11 Ency. 403, 405, 415; 35 S. C. 550; 35 S. C. 536; 38 S. C. 397; 21 S. C. 69; 3 McC. 412; 5 Rich. 8; Dud. 25. *Contracts of weak-minded persons:* 64 S. C. 272; 55 Me. 282; 86 Fed. R. 51; 29 Ency. 102. *Undue influence:* 118 U. S. 135; 116 Ill. 240; 5 Strob. 192.

The opinion in this case was filed on May 23, 1911, but remittitur held up on petition for rehearing until

December 19, 1911. The opinion of the Court was delivered by

MR. JUSTICE GARY.    This is an action to set aside a deed for fraud, and for other relief.

The facts are fully stated, in the decree of his Honor, special Judge Ernest Moore, which, together with appellant's exceptions, will be incorporated in the report of the case.

The first question that will be considered, is whether there was error on the part of the presiding Judge, in refusing the motion to allow the plaintiff, to amend the complaint in the particular mentioned in the first exception.   Amendments are within the discretion of the presiding Judge, and an order refusing a motion to amend, is not appealable, unless there was an abuse of discretion, which does not appear in this case.

We do not deem it necessary, to consider the other exceptions, specifically, as we are satisfied with the Circuit Judge's findings of fact, and the reasons assigned by him for his conclusions of law.

Affirmed.

Petition for rehearing refused by formal order filed December 19, 1911.