WILLE v. WILLE.

DEED.—EQUITY will set aside a deed obtained of a weak-minded, infirm and illiterate grantor by her son, through undue influence presumed from the relationship of the parties, and for an inadequate price, executed under the impression that it was a will. *Pressley* v. *Kemp,* 16 S. C., 334, *distinguished from this.*

Before KLUGH, J., Charleston, April, 1899. Reversed.

Action by Louisa Wille against Frederick C. Wille. The master's report is as follows:

"I find the following facts: The plaintiff is an aged, ignorant and illiterate woman, a German by birth and nationality. She can neither read nor write. In the year 1897 she owned the house on the south side of Line street, in the city of Charleston, described in the complaint in this action. She had bought it herself with her own money and the purchase price was $2,000. Her husband is dead. She has four daughters and one son, all adults; but at the time of the transaction hereinafter referred to she seems to have been living in the house by herself, her grand-son, Charles Schultz, a son of one of her daughters, who had been living with her, having returned to his mother's house on account of sickness. Mrs. Wille's son and her daughters were at enmity, and were not on speaking terms with each other. She had made a will, which had been drawn for her by her lawyer, Mr. John F. Ficken, in which she had devised the house to

this grand-son, upon the understanding that he was to live with her in the house during her life and bury her decently after her death.　In May, 1897, Mrs. Wille, the plaintiff, had an attack of typhoid fever.　It was a mild form of fever, 'one of those continued fevers lasting three or four months,' and in her case it continued through May and June and ended in the early part of July.　She was both physically and mentally weakened by the disease, but I do not think that the testimony sustains the contention that on the 19th of August, the date of the transaction hereinafter mentioned, she was either insane or imbecile, or mentally unsound.　She had, so far as I can judge, at that time regained her normal condition both of mind and body.　She was able to take a long walk, and could attend to her domestic affairs, but her knowledge or understanding of business matters, while probably no worse than usual, was certainly of a very rudimentary and unintelligent character.　About this time a proposition was made either by the plaintiff to the defendant, or by the defendant to the plaintiff, that she should change her will and revoke the devise to her grand-son, and should make a new will in favor of her son, upon condition that he should come and live in the house with his mother, make such repairs as were necessary, take care of the plaintiff during her life and give her 'a first class funeral' after she was dead. It is not important to determine with whom this proposition originated, for it is admitted by the defendant that his mother's offer in the first instance was that she 'would will him the property.'　The defendant told his mother that he had heard that she had already made a will, prepared by Mr. Ficken, in favor of her grand-son, but that he would think the matter over.　She then requested him to go to see her lawyer, Mr. Ficken, and 'ask him his opinion about it and what she could do in reference to the will on the property.' The defendant declined to go to Mr. Ficken, saying that he preferred to consult his own lawyer, Mr. Legare, who was a member of his lodge and a particular friend of his.　He did consult Mr. Legare, who told him that it would not be safe

for him to enter into any arrangement in which he would have to spend'any money or do anything dependent upon his mother making a will in his favor, because a will could be changed at any time, as was evidenced by the fact that his mother was now proposing to change the will which she had made in favor of Schultz. Mr. Legare, therefore, advised him that it would be necessary, if he wished to be secure, to have his mother make him a deed of conveyance of the property, and suggested that he should see his mother, explain the matter to her, and that if she was willing to deed him the property, he could bring her down to his law office, and that he would then himself explain the matter to her, and if she still wished to deed the property to him or give it to him entirely, he (Mr. Legare) would draw the deed. A day or two after this conversation Mrs. Wille and her son came to Mr. Legare's office together. She walked down from Line street to Broad where the office was, and brought with her a bundle of papers containing the old will and the title deeds of the house. Mr. Legare talked to her for at least twenty minutes, explained the whole matter to her as carefully and clearly as possible; told her of the difference between a will and a deed, and that the one was revocable and the other not; and upon being satisfied that she understood him, and that she desired to make the deed in question, he called a clerk, had the deed drawn, read it over to Mrs. Wille, who signed it by making her mark, and it was duly executed and delivered. The will drawn by Mr. Ficken in favor of Schultz was thereupon destroyed, either by the plaintiff or by Mr. Legare with her consent. The plaintiff and defendant then went away together. They stopped at the insurance office, and the defendant arranged about the transfer of the insurance policy on the house, the plaintiff remaining in the outer office. All this was done quite openly, there was no attempt at concealment or misrepresentation; and it may be remarked just here that there is no evidence of any fraud on the part of this defendant, nor do I believe that any was intended or attempted. So far as Mr. Legare is concerned, he took the

utmost care to explain the whole affair to Mrs. Wille, and I
am satisfied that he was entirely convinced of the *bona fides*
of the whole transaction, and believed that Mrs. Wille under-
stood fully what she was doing. After this the defendant
and his family went to live with his mother in the house, and
the defendant made certain repairs to the house and out-
buildings, doing some of the work himself, and employing
a carpenter to do the rest. The value of these repairs, how-
ever, is not above $20. After living in the house with the
plaintiff for a short while, the defendant became dissatisfied
with the neighborhood, and removed from the house. He
has not interfered wth his mother's use and occupation of
the premises since his departure, but has paid the insurance,
taxes and other fixed charges on the property to an amount
not ascertained in testimony; but has not contributed other-
wise to her support. Some time subsequent to the making
of the deed, Mrs. Duffy, one of Mrs. Wille's daughters, who
had been absent from the city, returned there, and in accord-
ance with a previous arrangement went to her mother's
house, expecting to take up her residence there with her
mother. When she got there her mother told her that she
had made other arrangements, and had made a will leaving
the house to her son, the defendant, and that he was to sup-
port her and bury her when she died. Mrs. Duffy, who
was, as has been stated, at enmity with her brother, there-
upon went to live somewhere else. Some days after she
took up the morning's paper, being the News and Courier
for September 8th, 1897, and saw in the column headed
'Real Estate Transfers' the following notice: 'Louisa Wille
to Frederick C. Wille, premises south side of Line street, for
$5.' Surprised at this, she went to her mother's and told
her of it, whereupon Mrs. Wille said that it was not true;
that she had made a will and not a deed, and had willed the
property to her son. As a result of this information, the
plaintiff then consulted her attorneys, Messrs. Ficken,
Hughes & Ficken, and the present action was brought. The
complaint seeks to set aside the conveyance to the defendant

as fraudulent in law, and alleges that the deed was signed by the plaintiff under a mistake and misapprehension, and that she believed when she executed the paper that she was making a will and not a deed. The answer of the defendant denies these allegations, and alleges that the deed was executed by the plaintiff willingly and with full knowledge of the force and effect of said deed, and with the intention of making a deed in fee simple to said property, and of absolutely vesting the same in the defendant. That the plaintiff was not incapacitated from making said deed, nor was any misrepresentation made to her; and that the defendant entered under said deed and made permanent and valuable improvements on the property.

"I find, as matter of fact, from the testimony, that no intentional fraud or imposition was practiced upon the plaintiff, but that she is an ignorant, infirm and illiterate woman, and was not at the date of this transaction capable of understanding the meaning of what she was doing, and did not in fact understand it. That she performed the manual act of making her mark to the said deed with the belief that she was executing a will, and that it was not her intention to make a deed of conveyance of said property, and that the said deed was executed under a mistake of fact. The principle of equitable jurisdiction under which the relief prayed for in this action is sought is well stated in the case of *Sears v. Shafer,* 6th New York Court of Appeals Reports, page 271: 'A court of equity interposes its benign jurisdiction to set aside instruments executed between persons standing in the relations of parent and child, guardian and ward, physician and patient, solicitor and client, and in various other relations in which one party is so situated as to exercise a controlling influence over the will and conduct and interests of another. In some cases, undue influence will be inferred from the nature of the transaction alone; in others, from the nature of the transaction, and the exercise of occasional, or habitual, influence. The following authorities will show the existence of the principle, and the character and degree of

influence against which the Court will relieve (*Casborne* v. *Barsham,* 2 Brev., 75; Hill on Trustees, 156, 157, 158, 159, 162; *Dent* v. *Bennett,* 7 Simons, 539; Story's Eq. Jur., 308-324; *Wood* v. *Downes,* 15 Ves., 120; *Huguenin* v. *Basely,* 14 *Id.,* 273).' The plaintiff is not seeking to have the deed referred to reformed, but to have it cancelled and set aside. In the case of *Werner* v. *Rawson* (Ga.), reported in 15 S. E. Reporter, page 814, it is said: 'There is a plain distinction between reforming a writing and cancelling it. Unquestionably, it is true that, to enable a court to reform an agreement evidenced by writing on the ground of mistake, it must affirmatively appear that the mistake was common to both parties, and that the writing, as executed, expresses the contract as understood by neither.' The reason for the rule is forcibly stated by Ames, C. J., in *Diman* v. *Railroad Co.,* 5 R. I., 134, who says: 'A court of equity has no power to alter or reform an agreement made between parties, since this would be in truth a power to contract for them; but merely to correct the writing executed as evidence of the agreement, so as to make it express what the parties actually agreed to. It follows that the mistake which it may correct in such a writing must be, as it is usually expressed, the mistake in the drafting of the writing as makes it convey the intent or meaning of neither party to the contract. If the court were to reform the writing to make it accord with the intent of one party only to the agreement, who averred and proved that he signed it as it was written by mistake, when it exactly expressed the agreement as understood by the other party, the writing, when so altered, would be just as far from expressing the agreement of the parties as it was before; and the court would have been engaged in the singular office, for a court of equity, of doing right to one party at the expense of a precisely equal wrong to the other. Equity will not reform a written contract unless the mistake is proved to be the mistake of both parties, but may rescind and cancel a contract upon the ground of a mistake of facts material to the contract of one party only.' 15 Amer. &

Eng. Enc. Law, 647.   The mistake 'must be mutual, if the complainant wishes to have the instrument reformed, and not simply set aside, because equity cannot undertake to reform on the ground of the ignorance or misapprehension of one of the parties as to any facts, though it may rescind.' Bisp. Eq. (4th ed.), 191.   So, 'cancellation is appropriate when there is an apparently valid written agreement or transaction embodied in writing, while in fact, by reason of a mistake of both or one of the parties, either no agreement at all has really been made, since the minds of both parties have failed to meet upon the same matters, or else the agreement or transaction is different, with respect to its subject matter or terms, from that which was intended.'   2 Pom. Eq. Jur. (2d ed.), 870.   'A mistake on one side may be a ground for rescinding a contract, or for refusing to enforce its specific performance, but it cannot be a ground for altering its terms.'   Adams Eq., p. 171.   And see *Douglass* v. *Grant,* 12 Ill. App., 273; *Dulany* v. *Rogers,* 50 Md., 524; *Diman* v. *Railroad Co., supra.*   See, also, upon the point of cancellation on the ground of mistake of one of the parties to an instrument, the case of *Ex parte Howlett,* 50 S. C., pages 8 to 11.   It is plain, therefore, that upon a proper case made, the Court of Equity will grant the relief sought for in this action; and under the state of facts existing in this case, I am clearly of opinion that such relief should be granted.   The deed sought here to be set aside was a voluntary conveyance between parties standing towards each other in a confidential relation.   They were unequally matched.   The plaintiff is an aged woman, ignorant, illiterate and infirm.   She was not represented by counsel in this transaction, and though Mr. Legare undoubtedly acted with the most scrupulous fairness, he yet represented the adverse party, he was a stranger to the plaintiff, and I am satisfied from the testimony taken altogether, that she did not understand what she was doing. Under these circumstances, the Court will set aside the deed and will restore the parties to the *status quo ante.*

"I therefore recommend that a decree be made directing

that upon the repayment by the plaintiff to the defendant of the amount expended by him in repairs to the property, to wit: the sum of $20, and of such amounts as the defendant may show by proper vouchers and testimony that he has expended for taxes and insurance thereon, the deed of conveyance above referred to be cancelled and set aside; and that the costs of this action be adjudged to be paid by the defendant.    In further support of the legal conclusions reached in this report, I refer to the case of *Parris* v. *Cobb,* 5 Rich. Eq., 458; *Banker* v. *Hendricks,* 24 S. C., 13; *Gaston* v. *Bennett,* 30 S. C., 479, and *Fishburne* v. *Ferguson,* 4 S. E. Rept., 573."

From Circuit decree reversing master, plaintiff appeals.

*Messrs. Ficken, Hughes & Ficken,* for appellant, cite: *As to executing one instrument when intending to execute another:* 1 N. & McC., 148; 50 S. C., 16.

*Messrs. Legare & Holman,* contra, cite: *As to setting aside the deed on the ground that grantor was overreached, and that it was executed under mistake in fact:* 16 S. C., 334; 26 S. C., 48; 40 S. C., 101; 38 S. C., 192.

April 16, 1900.   The opinion of the Court was delivered by

MR. JUSTICE JONES.   This is an action by a mother to cancel a deed of conveyance to her son, on the ground of undue influence and mistake.  The master, after making a detailed statement of specific facts, concluded "that no intentional fraud or imposition was practiced upon the plaintiff, but that she is an ignorant, infirm, illiterate woman, and was not at the date of this transaction capable of undersanding the meaning of what she was doing, and did not, in fact, understand it.   That she performed the manual act of making her mark to the said deed with the belief that she was executing a will, and that it was not her intention to make a deed of conveyance of said property, and that the said deed

was executed under a mistake of fact." The master further found as follows: "The deed sought to be set aside was a voluntary conveyance between parties standing towards each other in a confidential relation. They were unequally matched. The plaintiff is an aged woman, ignorant, illiterate and infirm. She was not represented by counsel in this transaction, and though Mr. Legare undoubtedly acted with the most scrupulous fairness, he yet represented the adverse party, he was a stranger to the plaintiff, and I am satisfied from the testimony taken altogether, that she did not understand what she was doing. Under these circumstances, the Court will set aside the deed and will restore the parties to the *status quo ante.*" He, therefore, recommended a cancellation of the deed and a restoration of the *status quo.* For a more detailed statement of the facts as found by the master, reference may be had to his report herewith.

Upon exceptions which are not set out in the "Case" before us, the Circuit Court reversed the master and dismissed the complaint in a brief decree which we here quote: "This is an action, as appears from the complaint, to vacate and set aside a deed of conveyance made and executed and delivered to the defendant by the plaintiff, on the 19th day of August, 1897, and for a cancellation thereof, upon the grounds, as alleged in the complaint, that the plaintiff was overreached and taken advantage of by the defendant in such transaction. The defendant answered the complaint and denied the allegations thereof, and alleged that said deed was freely and voluntarily executed by plaintiff. The above cause was referred to G. H. Sass, Esq., one of the masters for Charleston County, to take the testimony on the issues raised by the pleadings herein, and report his conclusions of law and fact thereon. The above cause came on to be heard before me at the March term, 1899, of the Court of Common Pleas for Charleston County, upon the pleadings, evidence and exceptions to the master's report on behalf of defendant. The master filed an elaborate report on the questions of law and fact involved herein. The master found

among other things as follows: 'I do not think the testimony sustains the contention that on the 19th of August, the date of the execution of said deed, she was either insane or imbecile, or mentally unsound. She had, as far as I could judge at the time, regained her normal condition.' I must, therefore, hold on this finding on the part of the master, that the plaintiff, Mrs. Wille, had sufficient mental capacity to understand and comprehend the nature and consequence of her acts, when she executed said deed. The master also found, 'there was no attempt at concealment or misrepresentation; and it may be remarked just here that there was no evidence of any fraud on the part of this defendant, nor do I believe that any was intended or attempted; so far as Mr. Legare is concerned, he took the utmost care to explain the whole affair to Mrs. Wille.' It also appears from the testimony of one of the plaintiff's witnesses, strongly relied upon to support her case, that plaintiff was under the impression, after she executed said paper, that she had parted with all dominion and control over the said property. I, therefore, hold that the master's conclusions from the facts herein are erroneous, and that the report must be overruled and reversed. It is further ordered and adjudged, that the exceptions to the master's report be and the same are hereby sustained. It is further ordered, that the complaint herein be and the same is hereby dismissed."

From this judgment, the plaintiff appeals upon the following grounds: "I. That the said Judge erred in holding that this was an action to vacate a deed of conveyance simply on the ground that the said plaintiff was overreached and taken advantage of by the defendant herein. II. That the said Judge erred in holding that because the master found that the said plaintiff had regained her normal mental condition, it followed that the said mental condition was of such a character that she could understand the nature of her act when she executed the said deed. III. That the said Judge erred in holding that one of the chief witnesses of the plaintiff testified that the plaintiff after executing the said

deed was under the impression that she had parted from the control of the property described therein.   IV.  That the said Judge erred in reversing the master's conclusions that the said deed was executed under a mistake of fact.   V. That the said Judge erred in holding that the complaint herein be dismissed."

We are of the opinion that the judgment of the Circuit Court must be reversed.   The plaintiff at the time of the execution of the deed was about seventy-five years old, but recently up from a spell of fever.   She was born in Germany, could not speak English plainly, and could neither read nor write.   Her physician testified that while he did not consider her insane, she was not a person of ordinary comprehension.   She had previously made a will to her grand-son, who was living with her.   Just before making the deed, she had consented to change her will and make another in favor of the defendant, upon condition that he would live with her, repair the premises, take care of her during her life and bury her.   She wanted her son to confer with her lawyer, Mr. Ficken, who had prepared the former will.   The son declined this, because he preferred his own lawyer, Mr. Legare.   Mr. Legare advised him that a deed of conveyance was preferable to a will, as it could not be changed.   The defendant claims that he then conferred with his mother and she consented to give a deed, and defendant claims that in accordance with his lawyer's instructions he explained to his mother the difference between a will and a deed of conveyance.   Then in a few days the son accompanied his mother to the office of Mr. Legare, who seeing her aged and ignorant, conscientiously endeavored to explain to her the difference between a will and a deed of conveyance, and honestly believed that she did comprehend. The deed was then prepared by a clerk in the office, and while this was being done, there was striking evidence that all previous explanation by son and lawyer had gone for naught to her feeble memory and weak understanding, for she asked Mr. Legare whether the giving of the property to

Fred (the defendant), after she had made a will giving it to her grand-son, would get her into trouble. Then Mr. Legare deemed it his duty to explain again. The deed was then read to her, she said "that is all right;" and made her mark to the deed and left, but before reaching home told Mrs. Myers that she had been down and made her will. While Mr. Legare, when the deed was signed, believed she comprehended the nature of her act, is it probable that she did, in view of the failure of repeated efforts, just previously made, by the defendant as well as by himself, to make her comprehend? We are constrained to concur with the master, who saw and heard the witnesses, including the plaintiff and defendant, that plaintiff did not comprehend, and was incapable of comprehending, the nature and consequences of her act. The Circuit Judge was mistaken in supposing that one of plaintiff's witnesses testified to a conversation with plaintiff after the execution of the deed, from which it appeared that she understood that she had parted with all dominion and control over the property. The witness referred to was Duncan, the carpenter, who made certain repairs on the premises, who was examined as a witness for the defendant, not the plaintiff, and in answer to questions by defendant's counsel, this is what he said in that connection: "Q. Did she say anything about the ownership, or who owned the house? A. Yes, she said she had nothing to do with the place at all. She said she had given it to her son, and that she had no authority to give me work at all. Q. Did she say anything about a will? A. Yes; she said she had willed everything she had over to her son, and could not give me any authority at all. Q. Did she say that she had willed it over to him or given it to him? A. She said she had made her will, and made it over to him. Q. Did she tell you anything about having nothing more to do with her property? A. Yes, she said she had nothing to do with it, no more than I had." This testimony is rather corroborative of the view that plaintiff believed she had made a will and not a deed of conveyance, and it certainly shows that

plaintiff did not comprehend the difference between a will and a deed of conveyance. While the master acquitted the defendant of intentional fraud or imposition, we think he was well warranted in holding that plaintiff executed the deed believing in her weakness of mind that she was making her will. The master did not say so in so many words, but we construe the last part of his report, expressly in view of the cases cited by him to sustain his last conclusion, that the deed was procured by the defendant through undue influence, presumed from the relationship of the parties and the absence of an adequate consideration. Such a conclusion is well warranted by the facts of the case. Here is an aged, illiterate and very weak-minded mother on one side, without any independent adviser, and on the other is an only son, whom she wishes to live with her and take care of her. She proposes a will in his behalf on the conditions named, and he sets himself to work to procure, and does procure, from his feeble-minded mother an absolute conveyance of all her property for a nominal consideration of $5, which was not paid. He moves to the house and expends, not including his own labors, about $20 in repairs. Without fault in the mother, he soon leaves the house and has not since contributed to the support of the mother. A Court of Equity ought not to be and is not a shield or refuge for those who make improvident or even reckless contracts, but it would not deserve respect, if it had not both power and willingness to shield an infirm and helpless mother from the grasping son, who would take her all for nothing. We cannot do better than quote the language of the Supreme Court of the United States, in the case of *Allore* v. *Jewell,* 94 U. S., 506: "It is not necessary in order to secure the aid of equity to prove that the deceased (grantor) was at the time insane or in such a state of mental imbecility as to render her entirely incapable of executing a valid deed. It is sufficient to show that from her sickness and infirmities she was at the time in a condition of great mental weakness, and that there was gross inadequacy of consideration for the conveyance.

From these circumstances, imposition or undue influence will be inferred. In the case of *Harding* v. *Wheaton,* reported in 2d Mason, 378, a conveyance executed by one to his son-in-law for a nominal consideration, and upon a verbal arrangement that it should be considered as a trust for the maintainance of the grantor, and after his death, for the benefit of his heirs, was, after his death, set aside, except as security for actual advances and charges, upon application of his heirs, on the ground that it was obtained from him when his mind was enfeebled by age and other causes. 'Extreme weakness,' said Mr. Justice Story, in deciding the case, 'will raise an almost necessary presumption of imposition, even when it stops short of legal incapacity; and though a contract, in the ordinary course of things, reasonably made with such a person, might be admitted to stand, yet if it should appear to be of such a nature that such a person could not be capable of measuring its extent or importance, its reasonableness or its value, fully and fairly, it cannot be that the law is so much at variance with common sense as to uphold it.' The case subsequently came before this Court; and in deciding it, Mr. Chief Justice Marshall, speaking of this, and it would seem of other deeds executed by the deceased, said: 'If these deeds were obtained by the exercise of undue influence over a man whose mind had ceased to be a safe guide of his actions, it is against conscience for him who has obtained them to derive any advantage from them. It is the peculiar province of a court of conscience to set them aside. That a Court of Equity will interpose in such a case, is among the best settled principles.' *Harding* v. *Handy,* 11 Wheat., 125. The same doctrine is announced in adjudged cases almost without number; and it may be stated as settled law, that whenever there is great weakness of mind in a person executing a conveyance of land, arising from age, sickness or any other cause, though not amounting to absolute disqualification, and the consideration given for the property is grossly inadequate, a Court of Equity will, upon proper and reasonable application of the

injured party or his representatives or heirs, interfere and set the conveyance aside." The Court, in the cases of *Banker* v. *Hendricks,* 24 S. C., 1, and *Gaston* v. *Bennett,* 30 S. C., 473, approved the principle as stated in 1 Story Eq. Jur., sec, 238, that "the acts and contracts of persons who are of weak understandings and who are thereby liable to imposition, will be held void in Courts of Equity—if the nature of the act or contract justify the conclusion that the party has not exercised a deliberate judgment, but that he has been imposed upon, circumvented or overcome by cunning artifice or undue influence." The case of *Pressley* v. *Kemp,* 16 S. C., 334, cited by respondent, is very different from this case. In that case the deed was prepared by an attorney under the direction of the grantor who executed it, after reading it over, with full knowledge and comprehension of what she was doing.

The judgment of the Circuit Court is reversed, the deed of conveyance involved is set aside and cancelled, and the case is remanded for further proper proceedings in accordance with the recommendations of the master.