16993

ELMORE L. OWENS, Respondent, v. LONNIE SWEAT, Appellant
(86 S. E. (2d) 886)

*Messrs. Hawkins & Bethea,* of Dillon, and *Woods & Woods,* of Marion, *for Appellant,*

*Messrs. Norton, Norton & Norton,* of Marion, *for Respondent,*

*Messrs. Hawkins & Bethea,* of Dillon, and *Woods & Woods,* of Marion, for *Appellant, in reply.*

April 14, 1955.

STUKES, Justice.

The illiterate plaintiff in this action, now respondent, owned and operated for many years a farm in Marion County from which he derived a livelihood for himself and his wife. At above sixty years of age in 1947 he suffered a paralytic stroke which was diagnosed by the medical witness as cerebral arteriosclerosis, after which and because of his resulting incapacity his present wife managed and operated the farm. He had been formerly married and separated, and his first wife is living although there was evidence that she may have forfeited her inchoate right of dower in his lands. However, the possibility of the claim worried respondent who was desirous that his second wife have his property. The defendant, who is now appellant, younger and more active and experienced in business than respondent, was an old and trusted friend. He married the daughter of a former housekeeper of the respondent and the latter testified that he looked upon appellant as his son-in-law and relied upon his advice.

On May 9, 1950, respondent, without legal or other independent advice, conveyed his farm to appellant for the re-cited consideration of $7,000.00 and accepted in exchange deed to his wife of an undesirably located house and lot in the town of Dillon for the stated consideration of $2,000.00 and appellant's mortgage, also to his wife, on the farm in the sum of $3,000.00 with five per cent interest thereon beginning January 1, 1951, and the principal payable January 1, 1955. The papers were prepared by a layman of appellant's selection and instruction who supervised the execution of them in his office in Dillon but did not read or explain them to respondent. Other evidence indicates that the consideration for appellant's deed to respondent of the Dillon house and lot was erroneously stated in the deed and

was intended to be $4,000.00, which we think the evidence established was the fair value of it. Thus the consideration of respondent's deed of his farm was $7,000.00, as stated in it. He testified that he had previously been offered $9,-000.00 for it.

This action was brought by respondent on September 18, 1950, to rescind the transaction upon the ground of fraud, inadequate consideration, mental incapacity and undue influence. *Brock v. Brock*, 218 S. C. 174, 61 S. E. (2d) 885, was a similar suit but failed for lack of proof. It was alleged in substance in the complaint that respondent's purpose in the transaction was to clear his property of the dower claim of his first wife and was upon appellant's agreement to reconvey the property to respondent's wife or son, should respondent desire it.

The answer of appellant was, in effect, a general denial and a plea of the statute of frauds with respect to any agreement by him to reconvey the property, which agreement was denied in the answer.

The matter was referred to the Judge of Probate as Master who took voluminous testimony and found in favor of appellant. He chiefly relied upon the authority of *All v. Prillaman*, 200 S. C. 279, 20 S. E. (2d) 741, 159 A. L. R. 981. However, the controlling facts of the instant case were not present there; and it was an action to establish a constructive trust. Upon exceptions to the report it was reversed in a well-considered decree which will be affirmed. It concluded as follows: "The inadequacy of consideration, in conjunction, with the mental incapacity, undue influence and the fraud practiced by defendant, requires the granting of the relief as asked by plaintiff. The report of the judge of probate shows thorough study of the issues involved, and it is with regret that I cannot except the same."

The evidence leaves no doubt that there was very substantial inadequacy of consideration which, however, would not alone suffice to set the transaction aside; but it is important in connection with the other

factors of mental weakness, undue influence and the grantee's agreement to reconvey. A case involving only alleged inadequacy of consideration is *Holly Hill Lumber Co. v. McCoy,* 201 S. C. 427, 23 S. E. (2d) 372, 378, where specific performance was decreed; but the following was quoted with approval from Pomeroy, Eq. Jur., within which we think the case in hand fairly comes:

"When the accompanying incidents are inequitable and show bad faith, such as concealment, misrepresentations, undue advantage, oppression on the part of the one who obtains the benefit, or ignorance, weakness of mind, sickness, old age, incapacity, pecuniary necessities, and the like, on the part of the other,—these circumstances, combined with inadequacy of price, may easily induce a court to grant relief, defensive or affirmative.' "

The following is from the leading case of *Du Bose v. Kell,* 90 S. C. 196, 71 S. E. 371, 380, in which a deed of gift was upheld:

"If the transaction had been regarded at the time by the grantor as a business transaction, whereby she was conveying the property to the grantee in consideration of past services alone, or if there were evidence going to show that she viewed it in the light of a commercial transaction, then the question sought to be made as to the adequacy of the consideration mentioned in the deed would be a matter of serious importance."

The clear preponderance of the evidence here is that respondent's farm was worth at the time of the transaction from $10,000.00 to $12,000.00 or more, whereas the total consideration to him was $7,000.00.

The evidence is likewise convincing that respondent's mental faculties were at least so impaired at the time of the transaction as to subject him to the undue influence which the record reflects. This is established by his testimony, that of his wife, his banker, his fertilizer dealer and the one medical witness. The physician who treated respondent from the

time of his stroke died pending the action and before his testimony was taken, and the doctor who testified did not examine him until over a year after the transaction at which time he found him incompetent to transact any business; but the doctor testified as an ·expert in answer to hypothetical questions and gave as his opinion that respondent was likewise mentally incompetent when he executed the conveyance of his farm.

The president of the bank with which respondent dealt testified that prior to respondent's stroke he attended to his banking business but afterward he paid no attention to it or to his farm and turned his business over to his wife. They obtained annual loans from the bank for which respondent's wife signed notes and drew checks for the money. The witness considered respondent in such condition that he would have no serious business dealings with him and thought a guardian would be necessary. In his opinion respondent was incapable of attending to any business after his stroke. The fertilizer salesman dealt with respondent whom he considered a good farmer, before his stroke in 1947 and afterward all of his transactions were with respondent's wife who would place the orders for fertilizer. The witness considered respondent incapable of transacting any business. Respondent's wife had a fifth-grade education; he appears to have had none, and could only "draw" his name.

The testimony of respondent and his wife also strongly tended to establish the truth of the allegations of the complaint and we do not think need be reviewed at length. The following are excerpts from his:

"Q. How did you come to sell your property to Mr. Sweat? A. I don't know, sir, just happened, I reckon. In other words, he advised me to sell it. Lonnie said it would be best for me to sell it.

Q. What for? A. On account of my former wife.

Q. What did he tell you about that? A. I was just talking with him about it because I could not make any will and could not deed it to my last wife.

Q. And what did he tell you? A. He told me to deed it to him and then he would deed it back to her, my last wife. But once the deed was made he would do nothing about it.

Q. Did you try to get him to deed it back to you, to her or your son? A. Yes, sir.

Q. What did he say—what reason did he give you for selling it to him? A. So my first wife couldn't get no part.

Q. And did you talk to any lawyer about it, or just take his word? A. I just took his word. * * *

Q. You tried to get him to deed it back to you? A. Yes, and he told me he reckon he had sold it and that it was too late—that he had chance to get $9,000.00 for it. And I said: "Lonnie, that is not what you told me—you said I could get it back if I was dissatisfied. * * *

A. Well, me and him (appellant) was talking about the place and I told him I didn't want to sell it because I was afraid I wouldn't be satisfied and would want it back. He said, 'Well, if I buy it and you want it back you can get it back except it will cost you a great deal more on account of the expenses.' He said, 'I will cancel the trade any time you want to.' "

Consideration of the whole of respondent's testimony indicates very clearly that he is of impaired mind and memory.

With reference to respondent's physical and mental condition his wife testified in part as follows:

"Q. Did his condition improve or grow worse after his first stroke? A. It gradually grew worse. .

Q. When did he have his next attack, if you remember, after the first one in 1947? A. The real bad one that he had to go to the hospital was the first of April, 1950.

Q. How long was that before these deeds were made? A. A little over a month. * * *

Q. How many doses of medicine would you give him during the day in addition to the sleeping powder? A. Those tablets that he took for pain and things were every four hours and I usually started about 6 in the morning and tried to give him as many doses as I could.

Q. During that time, and before he started giving you those things to knock him out at night, what did he do. How did his sleeplessness affect him? A. He was restless—up and down all night, and I would have to stay up with him plundering around over the house.

Q. Does Mr. Owens ever get lost in his house? A. Yes.

Q. How long has that been going on? A. Ever since the first of last year. * * *

Q. I notice he is not able to control his kidneys. How long has that been going on? A. About a year and a half.

Q. Does he seem to be embarrassed or to take any care about that? A. No.

Q. How about the control of his bowels? A. No. I had to give him a dose of medicine before I left home on that account. He has medicine that Dr. Bransford gives him for that.

Q. How much weight has he lost since his attack back there in 1947? A. Around 25 pounds.

Q. Does he ever take a bath or change clothes or anything unless it is required of him? A. No. * * *

Q. Has there been anything peculiar about his conversation and his ability to concentrate in the last two or three years? A. Yes, sir. He cannot carry a conversation straight, nor he cannot remember.

Q. Well, let me ask you this: I notice he cried a great deal on the stand this morning—is that customary? A. All the time.

Q. How long has that been going on? A. Ever since the first of last year.

Q. I also noticed while on the stand, on two or three occasions he laughed when there was no reason for it? How long has he been doing that? A. About the same length of time. * * *

Q. When did Mr. Owens during last year start worrying about this old marriage he had had some years ago? A. He didn't start until after he had that severe attack and was

sick and had to go to the hospital, and he got worried about it then.

Q. Why did he seem to worry about that old marriage? A. Well, people would advise him that his wife would get what he had—said she would come and take what he had.

Q. Did he talk about that a great deal, or not? A. Yes. * * *"

Appellant objected to the evidence adduced in behalf of respondent in proof of the contemporaneous parol agreement of appellant to reconvey the farm if respondent became dissatisfied with the trade, and the evidence was admitted subject to the objection. However, the competence of it need not be passed upon in view of the similar evidence offered by the appellant which will be adverted to later in this opinion.

The fact that respondent conveyed his farm, apparently his only real property and his sole means of support, from the operation of it by his wife, for an unproductive house in town, which the evidence establishes was in poor repair, is in itself of significance. In addition he received, as said, a mortgage payable to his wife almost five years afterward. A suspicious circumstance in appellant's conduct, to which equity will look, is the fact that he prepaid the mortgage to respondent's wife in about a month after it was given, although it was not due until nearly five years later; and at a time when respondent was seeking the reconveyance of his farm and when appellant needed funds for the building of his new home. The decree under appeal provides for refund of this money to the appellant (tender of which he refused) and also for reimbursement of him of the taxes which he has paid upon the farm pending the litigation.

The appellant testified under examination by his own counsel, without reservation or objection, that he acquired respondent's farm upon the agreement that he would reconvey. He said that respondent told him that his stepson, Albert Owens, wanted the place and had applied for a loan with which to purchase it; and respondent requested at the

time he made the deed that Elbert be given until the first of August; quoting himself, appellant testified that he told respondent before the latter executed the deed, "If he (Elbert) gets the loan through, I will make you that promise. If he gets it through by the first of August, I will give him the same privilege at the same price except he pays for all stamps, deeds and papers fixed up, and if I have any extra trouble, let him pay for that," to which respondent agreed. (Respondent's wife testified that the agreement specified October rather than August.)

About the middle or the latter part of June, after the transaction on the preceding May 9, appellant met Elbert at the office of the loan agent who declined to go forward with the application for the loan, with the proceeds of which Elbert planned to buy the property, unless appellant executed a ninety-day or longer option, which appellant refused to give. Quoting himself again, appellant testified that he told the loan agent, "I am under obligation to Mr. Owens to let Elbert have the farm by the first of August, and if not by then, I am not under no obligation, according to our agreement."

Respondent and his wife went to see appellant on the next day, after which appellant testified that he heard no more from them until about the middle of July when they visited him in Dillon and requested that he reconvey the farm and take back his house and lot, offering to pay him an unspecified profit. Appellant said that he replied, "You are too late," etc. Appellant testified that he further said to respondent: "You go on and be satisfied until I get through building—I don't know what it will cost me to build—but when I get through building, I will make up my mind about it, and if I let anybody have it, I will let you have it back, Elmore." The building referred to was on property not concerned in the litigation.

In conflict with the foregoing was the further testimony by appellant that he did not see respondent after the visit to the office of the loan agent until September 28 but mean-

while Mrs. Owens had been to his house about once a week asking that he reconvey the farm to them, to which he testified that he "made her no satisfaction" and she continued to come until near the first of August and he finally assured her that if he sold the farm, they could have it back. Then she tried to rent the property and offered $500.00 a year which he said was too little and asked $200.00 an acre for the tobacco allotment, which would have run the annual rental to over $1,000.00. The action was instituted shortly afterward.

Appellant further testified on direct examination that when respondent· first mentioned selling the farm to him he (respondent) said he wanted his wife to have what he had and that he was not satisfied with the way his business was fixed and felt that it was best that he should go ahead. With reference to the sudden and otherwise unexplained pre-payment of the mortgage to respondent's wife, which appellant testified was during the first or second week in June, appellant said that he decided to pay the mortgage after he had decided he might sell or trade the place, which was violative of his admitted agreement to hold it for reconveyance until the first of August.

On cross-examination appellant admitted that he knew respondent had a former living wife and that he had been feeble since his stroke in 1947; and appellant further admitted that respondent offered him $500.00 profit to undo the trade, and said, "When I traded with him (respondent), I traded with him," which was in conflict with his testimony that it was agreed upon at the time of the transaction that appellant would hold the farm subject to reconveyance until August 1. The latter time limit (even if not October as contended for respondent) is, we think, unimportant in the controversy because of appellant's prior repudiation of his admitted agreement to reconvey. The evidence establishes that this agreement was a means of undue influence upon respondent in his enfeebled mental condition. We conclude from all of the evidence that it was never the

intention of appellant to perform his promise to reconvey, which is a finding of fraud in the procurement of the deed.

Reliance was largely had by the lower court upon the authority of *Page v. Lewis,* 209 S. C. 212, 39 S. E. (2d) 787, which is similar in many respects to this case, although there the deeds were without consideration while here the consideration was palpably inadequate, as found by the trial court. Our leading case upon mental competence to make a deed is *Du Bose v. Kell, supra,* 90 S. C. 196, 71 S. E. 371, in which the deed was upheld, but there was no evidence of undue influence and no repudiation of a contemporaneous agreement to reconvey, as here. That case was briefly reviewed and subsequent similar cases cited in *Mathias v. Mathias,* 206 S. C. 276, 33 S. E. (2d) 626.

If it were conceded, as contended by appellant, that under the rule of the last cited cases the evidence did not establish respondent's mental incompetence to make the deed, that would not result in reversal; this because of the presence of the additional vitiating factors which have been referred to. As said in *Page v. Lewis* [209 S. C. 212, 39 S. E. (2d) 801], "There are many other cases where deeds have been set aside, and the cases are likewise numerous where the Court has refused to set them aside, for it depends upon the facts and circumstances of the particular case." The following was quoted with approval from *Wille v. Wille,* 57 S. C. 413, 35 S. E. 804:

" 'This court, in the cases of *Banker v. Hendricks,* 24 S. C. 1, and *Gaston v. Bennett,* 30 S. C. [467] 473, 9 S. E. 515, approved the principle as stated in 1 Story Eq. Jur., § 238, that: "The acts and contracts of persons of weak understanding and who are thereby liable to imposition, will be held void in courts of equity, if the nature of the act or contract justify the conclusion that the party has not exercised a deliberate judgment, but that he has been imposed upon, circumvented, or overcome by cunning artifice or undue influence." ' "

In the *Wille case* [57 S. C. 413, 35 S. E. 809] the following was quoted from the opinion in *Allore v. Jewell,* 94 U. S. 506, 24 L. Ed. 260: " 'It is not necessary, in order to secure the aid of equity, to prove that the deceased (grantor) was at the time insane, or in such a state of mental imbecility as to render her entirely incapable of executing a valid deed. It is sufficient to show that from her sickness and infirmities she was at the time in a condition of great mental weakness, and that there was gross inadequacy of consideration for the conveyance. From these circumstances imposition or undue influence will be inferred' "; and the following from the pen of Chief Justice Marshall in the old case of *Harding v. Handy,* 11 Wheat. 103, 125, 6 L. Ed. 429: " 'If these deeds were obtained by the exercise of undue influence over a man whose mind had ceased to be a safe guide of his actions, it is against conscience for him who has obtained them to derive any advantage from them. It is the peculiar province of a court of conscience to set them aside. That a court of equity will interpose in such a case is among the best settled principles."

All of the questions presented in argument by appellant have been considered and are answered in the foregoing except that which relates to the lower court's apparently inadvertent finding that appellant refused $1,500.00 profit for reconveyance of the property. He admitted the refusal of $500.00, not $1,500.00. The error is manifestly immaterial.

The costs of the action were properly awarded to respondent.

Affirmed.

BAKER, C. J., and TAYLOR, OXNER and LEGGE, JJ., concur.