## 18921

Dr. Joseph HODGE, Respondent, v. George A. Shea and Carrie S. Shea, Appellants.

(168 S. E. (2d) 82)

*Messrs. Holcombe, Bomar & Cureton,* of Spartanburg, for *Appellants,*

*Messrs. Edward C. Roberts* and *Geddes H. Martin,* with *Ralph C. Robinson, Jr., on the Brief,* of Columbia, *for Respondent,*

*Messrs. Holcombe, Bomar & Cureton,* of Spartanburg, for *Appellants, in Reply,*

May 14, 1969.

BRAILSFORD, Justice.

In this equitable action the circuit court decreed specific performance of a contract for the sale of land, and the de-

fendant has appealed. The plaintiff is a physician, and the contract was prepared and executed in his medical office on August 19, 1965. The defendant had been plaintiff's patient for a number of years. On the contract date, he was seventy-five years of age, was an inebriate of long standing, and was afflicted by grevious chronic illnesses, including arteriosclerosis, cirrhosis of the liver, neuritises, arthritis of the spine and hip and varicose veins of the legs. These afflictions and others required constant medication and frequent medical attention, and rendered him infirm of body and mind, although not to the point of incompetency to contract.

During the period immediately before and after August 19, 1965, George A. Shea, the defendant, was suffering a great deal of pain in his back and hip and was having difficulty in voiding. He was attended professionally by the plaintiff, Dr. Joseph Hodge, either at the Shea home, at the doctor's office or in the hospital at least once each day from August 9 through August 26, 1965, except August 17. The contract was signed during the morning of August 19. One of Dr. Hodge's frequent house calls was made on the afternoon of that day, and Mr. Shea was admitted to the hospital on August 21, where he remained until August 25.

Mr. Shea was separated from his wife and lived alone. He was dependent upon Dr. Hodge for house calls, which were needed from time to time. His relationship with his physician, who sometimes visited him as a friend and occasionally performed non-professional services for him, was closer than ordinarily arises from that of a patient and physician.

Mr. Shea owned valuable property in and near the City of Spartanburg. However, he was in serious financial difficulties. For at least several years prior to August 19, 1965, he had been indifferent and irresponsible about the management of his affairs. In 1962, a building on North Liberty Street was sold by the South Carolina Tax

Commission, inferably for much less than its value, to satisfy a deficiency tax assessment against Mr. Shea. At the same time, large claims for Federal income taxes were pending against him, which resulted in the filing in May, 1964, of a tax lien for some $250,000.00. One or more judgments were entered against him, on apparently debatable claims, by default.

Mr. Shea was seemingly indifferent toward these reverses and made no effort to prevent the sale of the North Liberty Street property or to redeem it after the sale. This was accomplished by his son-in-law, William G. Ransdell, Jr., a lawyer of Raleigh, North Carolina, and by Mrs. Ransdell. Mr. Ransdell also assumed the responsibility, with Mr. Shea's complete acquiescence, of negotiating with the Federal authorities concerning the amount of the tax obligation and in trying to raise funds to satisfy the assessment after the lien was filed. These efforts involved negotiations for the sale of various parcels of real estate, which were carried on with Mr. Shea's full knowledge and consent. Mr. Shea placed his full confidence in "Buck", as he called his son-in-law, and assumed no initiative of his own.

A 125 acre tract of land near Mr. Shea's home, adjacent to land which was being developed as residential property, was one of his most valuable and readily salable assets. In 1962, the developer of this contiguous land had expressed to Mr. Shea an interest in it at $1000.000 per acre. A firm offer of this amount was made in November, 1964, and was refused by Mr. Shea on the advice of his son-in-law that the property was worth at least $1500.00 per acre. Negotiations between the developer and Mr. Ransdell commenced at that time and were in progress when Mr. Shea, at the instance of Dr. Hodge and without consulting Mr. Ransdell or anyone else, signed the contract of August 19, 1965. Under this contract Dr. Hodge claims the right to purchase twenty choice acres of the 125 acre tract for a consideration calculated by the circuit court to be the equivalent of $361.72 per acre. The market value of the land on the contract date

has been fixed by an unappealed finding of the master at $1200.00 per acre.

In June of 1966 the negotiations between Mr. Ransdel and the developer resulted in the sale of 66.35 acres of the 125 acre tract, with an option arrangement as to the remainder (which made appropriate reference to the cloud created by Dr. Hodge's claim) for $99,520.00 or $1500.00 per acre. This sale was closed at the Spartanburg County Court House, simultaneously with two others which Mr. Ransdell had negotiated, with all interested parties or their representatives present. The purchase money, supplemented by $85,000.00 which Mr. Ransdell had arranged to borrow, was used to discharge the tax lien and judgments against Mr. Shea.

The consideration was expressed in the contract between Dr. Hodge and Mr. Shea as follows:

"The purchase price being (Cadillac Coupe DeVille 6600) & $4000.00 Dollars, on the following terms: Dr. Joseph Hodge to give to Mr. George Shea a new $6600. coupe DeVille Cadillac which is to be registered in the name of Mr. George A. Shea at absolutely no cost to him. In return, Mr. Shea will give to Dr. Joe Hodge his 1964 Cadillac coupe DeVille and shall transfer title of this vehicle to Dr. Hodge. Further, Dr. Joseph Hodge will pay to Mr. George A. Shea the balance of $4000.00 for the 20 acres of land described above subject to survey, title check, less taxes on purchase of vehicle."

Dr. Hodge was fully aware of Mr. Shea's financial troubles, the liens on his property and his son-in-law's efforts in his behalf. He was also aware of his patient's predilection for new Cadillacs.[1] Although he was not obligated to do so until the property was cleared of liens, which was not accomplished until the following June, Dr. Hodge hastened to purchase a 1965 Cadillac Coupe DeVille and delivered

---

[1] A new Coupe DeVille figured in a 1962 land purchase by Dr. Hodge from his patient which greatly advantaged the doctor.

it to Mr. Shea on the day after his discharge from the hospital on August 25, 1965. If he acted in haste in an effort to fortify what he must have realized was a dubious contract, he has so far succeeded. The ground of the circuit court's favorable decision was that Mr. Shea's acceptance of the new Cadillac and his surrender of the old one to Dr. Hodge amounted to a binding confirmation of the contract. We quote from the decree:

"The inadequate purchase price for the property involved is clearly and convincingly established. The very close association of plaintiff and defendant Shea as doctor and patient, considered in the light of the ill health and infirmity of Shea, renders this transaction clearly suspect. The master expressly found, however, that there was no undue influence exercised by plaintiff. The record does not contain any clear proof of overreaching as such; but defendant makes a persuasive argument that all of the circumstances considered in their totality justify a refusal by the Court to decree specific performance. Were it not for the fact that the defendant Shea some five days after the contract accepted the new automobile and voluntarily and intentionally transferred his older car to plaintiff, I might be disposed to a different conclusion. * * *"

The court interpreted the report as including an affirmative finding that the transaction was not tainted by undue influence, but neither joined in nor rejected such finding. Instead, the court made the negative finding that the "record does not contain any clear proof of overreaching as such * * *." Actually, the master's finding was also negative. "I do not find from the testimony that there was any undue influence exercised by the plaintiff to obtain the agreement * * *." The difference is of paramount importance because from the circumstances of this case, i. e., the gross inadequacy of consideration, the confidential relationship of physician and patient, and the inequality between the parties resulting from the patient's infirmity of body and mind, an implication or presumption arose that the doctor

had obtained the advantage of his patient by fraud or over-reaching. The burden was upon Dr. Hodge to remove this presumption by affirmative proof of the complete fairness of the transaction, including proof that the terms of the contract were fully understood by Mr. Shea, and that his assent thereto was the product of a deliberate exercise of his own judgment, uninfluenced by any unfair representation, inducement or enticement. 41 Am. Jur., Physicians and Surgeons, Sec. 74, p. 196; *Hewett v. Bullard,* 258 N. C. 347, 128 S. E. (2d) 411; *Peterson v. Budge,* 35 Utah 596, 102 P. 211; *Matthaei v. Pownall,* 335 Pa. 460, 84 A. 444: *Clinton v. Miller,* 77 Okl. 173, 186 P. 932; *Norflett v. Beall,* 82 Miss. 538, 34 So. 328; *Butler v. Gleason,* 214 Mass. 248, 101 N. E. 371; *Cadwallader v. West,* 48 Mo. 483.

All of the above cited decisions involved the physician-patient relationship. In each of them the burden was upon the physician to establish the complete fairness of the transaction in which the physician obtained a benefit. In the *Hewett* case, *supra,* the point was stated tersely:

"Where a physician regularly treats a chronically ill person over a period of two years, a confidential relationship is established, raising a presumption that financial dealings between them are fraudulent." 128 S. E. (2d) at 413.

No South Carolina case involving the physician-patient relationship has been cited or found by us. However, the applicable principles are the same as in our rather numerous desicions involving persons in other confidential relationships. See, for example, *Wille v. Wille,* 57 S. C. 413, 35 S. E. 804; *Zeigler v. Shuler,* 87 S. C. 1, 68 S. E. 817; *Devlin v. Devlin,* 89 S. C. 268, 71 S. E. 966.

Even absent a confidential relationship, this court has several times approved the principle stated in *Allore v. Jewell,* 94 U. S. 506, 24 L. Ed. 260, that imposition or undue influence upon the grantor will be inferred from proof of great mental weakness, not amounting to incapacity to execute

a valid deed, accompanied by gross inadequacy of consideration. See *Owens v. Sweat*, 227 S. C. 112, 124, 86 S. E. (2d) 886, 892, and decisions therein cited.

In a great opinion by Judge Desaussure in *Butler v. Haskell*, 4 Desaus. (4 S. C. Eq.) 651, 678 (1816) is found an exhaustive review of authorities bearing upon the issue "whether (a) great inadequacy of the price alone, or coupled with other circumstances, does not furnish a ground from which the court is bound to infer, that the bargain was too unconscientious to be supported in a court of equity?" 4 Desaus, at 686. After this examination of the decided cases, with the full concurrence of the court, Judge Desaussure stated:

"I consider the result of the great body of the cases to be, that wherever the court perceives that a sale of property has been made at a grossly inadequate price, such as would shock a correct mind, this inadequacy furnishes a strong, and in general a conclusive, presumption, though there be no direct proof of fraud, that an undue advantage has been taken of the ignorance, the weakness, or the distress and necessity of the vendor; and this imposes on the purchaser a necessity to remove this violent presumption by the clearest evidence of the fairness of his conduct; * * *. The relief is extended * * * to all who are weak, or necessitous, or not perfectly cognizant of their rights, * * *. And the answer of the defendant denying fraud in the transaction, though entitled to much weight, is by no means conclusive; but the Court gives relief on strong counter testimony, or on the great intrinsic evidence of gross inadequacy, coupled with other circumstances, such as weakness or necessity in the seller, confidence reposed in the buyer, & c. And the decided cases further shew that the hazard run by the buyer of losing what he advances on some contingency, does not prevent the Court from giving relief; * * *." 4 Desaus, at 697-98.

The case at hand is attended by gross inadequacy of consideration, serious impairment of the grantor's mentality

from age, intemperance and disease, and a confidential relationship between the grantee and grantor. Has the strong presumption of vitiating unfairness arising from this combination of circumstances been overcome by the evidence? We must conclude that it has not. The record is devoid of any evidence suggesting a reason, compatible with fairness, for Mr. Shea's assent to so disadvantageous a bargain. Disadvantageous not only because of the gross disparity between consideration and value, but because of the possibility that the sale would impede the important negotiations in which Mr. Ransdell was engaged. Unless his memory failed him, Mr. Shea knew that his son-in-law expected to sell the 125 acre tract for about $1500.00 per acre as an important step toward raising sufficient funds to satisfy the tax and judgment liens against the Shea property. These circumstances furnish strong evidence that Mr. Shea's assent to the contract, without so much as notice to Mr. Randsell, was not the product of a deliberate exercise of an informed judgment. Without suggesting that this transaction could be sustained as an act of generosity prompted by past favors, we point out that Dr. Hodge does not urge this view. Instead, he testified that the transaction was a "business deal" and that he bargained to pay all that the land was worth at the time. Quoting from his testimony, "(T)here was a tax lien on this property and when I purchased it this was a speculative problem. I didn't know that I'd ever get title to this property and this was a gamble that I had to take when I signed for this property." This contention would have little appeal to a court of equity even if Dr. Hodge had incurred a risk of loss from a title defect, against which, in fact, he was protected. By the terms of the contract, he could have lost only his enormous bargain if the liens had not been cleared.

The record also discloses an unfair disparity between the oral agreement as testified to by Dr. Hodge, and the written contract as formulated in his office. Dr. Hodge testified that for the twenty acres of land he had offered Mr. Shea

his choice between $10,000.00 or a $6,600.00 Coupe Deville Cadillac plus $4,000.00; and that Mr. Shea accepted the alternative proposal. Dr. Hodge's statement of the terms on which he offered to purchase the land appears several times in the record without material variation. There is no testimony that the parties had any further discussion as to terms. The written contract, as formulated in Dr. Hodge's office, with no third party present except Dr. Hodge's nurse or secretary, conferred upon Dr. Hodge the additional benefit of Mr. Shea's 1964 Cadillac, which he disposed of, after repairs, for a net gain of $2200.00. There was no attempt to explain this material variation from the terms previously proposed and accepted, and no testimony that this windfall of 22% of the original cash offer was even discussed by the parties.

There was also a disparity between the terms of the writing and the performance undertaken by Dr. Hodge. For twenty acres of land and Mr. Shea's 1964 Cadillac, Dr. Hodge promised "a new $6600 coupe DeVille Cadillac" and $4,000.00. The list price of the 1965 Cadillac which Dr. Hodge delivered to Mr. Shea was $6,434.43. However, it was purchased from the dealer for $1,000.00 less than this amount, and in August, 1965, this type automobile was readily available at the lower figure from authorized Cadillac dealers.

Although Dr. Hodge had offered the equivalent of $530.00 per acre for the land, the variations in the formulation of the contract and in its performance reduced the per acre price, as calculated by the circuit court, to the equivalent of $361.72, at which figure specific performance was decreed.

Finally, on this phase of the case, it would be naive not to recognize that the 1965 Cadillac was used to entice a highly susceptible old man into a hard trade. Mr. Shea was fatuously fond of new Cadillacs, but was apparently incapable of taking care of one. His own 1964 model (he had also had a 1963 model) had been badly abused. Accord-

ing to Dr. Hodge, it "smelled like a toilet. * * * had several fenders bumped, bullet holes in the top and the car was just filthy * * *. It was a rather foul car." There is no suggestion in the record that Dr. Hodge had any connection with an automobile business. Knowing the condition of Mr. Shea's car, his financial predicament and the activities of his son-in-law in his behalf, Dr. Hodge used the new automobile as a means of influencing Mr. Shea to agree to sell. The means was calculated to becloud Mr. Shea's judgment, and, under the circumstances, its use was unfair.

We think that the court erred in giving controlling weight to the exchange of automobiles, five days after the contract had been signed, as an "affirmance or ratification of the contract." This exchange was attended by the same inequitable incidents as affected the execution of the contract and had no tendency to ameliorate its unfairness. In fact, Dr. Hodge delivered an automobile of substantially less value than he contracted to provide, and there is no evidence that Mr. Shea was aware of this discrepancy when he accepted it. The answer asserts Mr. Shea's willingness to pay the difference in value between the two automobiles, and Dr. Hodge may apply for that relief in his action, if he be so advised. What has been said clearly shows that he is not entitled to the equitable remedy of specific performance, which is only available to enforce a contract that is "fair, just and equitable." *McChesney v. Smith*, 105 S. C. 171, 89 S. E. 639; *Holley v. Anness*, 41 S. C. 349, 19 S. E. 646.

It is said that, according to the majority view, *mere* inadequacy of consideration is not a ground for refusing the remedy of the specific performance; "in order to be a defense, the inadequacy must either be accompanied by other inequitable incidents, or must be so gross as to show fraud." Pomeroy's Equity Jurisprudence, Vol III (5th Ed. 1941) Sec. 926, p. 631.

A review of authorities found in the able opinion of Chancellor Caldwell in *Gasque v. Small*, 2 *Strob.* (21 S. C. Eq.) 72, indicates that the rule stated by

Pomeroy is a departure from formerly established principle. We refrain from quoting from the scholarly opinion in *Gasque,* which, apparently, has never been overruled, although *dicta* in some later decisions may suggest a departure from it. If *Gasque* is still good law with us, which we need not decide, it is certain that Dr. Hodge should be denied specific performance in this case for inadequacy alone, even if there were no other inequitable incidents. Of course, under the facts here appearing, the remedy would not be available even under what Pomeroy refers to as the majority rule.

The appeal is clearly meritorious and the departures ■ by appellant from the rules of this court in the preparation of it were entirely inadvertent, more of form than substance, and did not prejudice either the court or counsel in understanding the issues raised. We, therefore, deny respondent's motion to dismiss the appeal.

Reversed and remanded.

Moss, C. J., and LEWIS and BUSSEY, JJ., concur.

LITTLEJOHN, J. (dissents) :

I respectfully dissent and would affirm the order of Judge Weatherford.

The ordering of specific performance of a contract is a discretionary matter. Here we have a finding of both the Master in Equity (who had the benefit of observing the witnesses) and the Circuit Court that specific performance should be directed. Their concurrent finding and conclusions are entitled to much weight. The ruling of the lower court is amply supported by the evidence.

My conclusion is based on the entire record, but there are a few undisputed facts which to my mind compel an affirmance of the lower court. On August 26, 1965, several days after the contract was signed, Mr. Shea accepted a new Cadillac in part payment for the land, and executed proper instruments conveying to Dr. Hodge his old Cadillac. Three months later, on November 19, 1965, when the summons

(only) in this suit was served, Mr. Shea was riding in the Cadillac.

In the Spring of 1966 he refused to sign a deed presented by Attorney James R. Turner for Dr. Hodge, but stated "that he didn't want to sign it 'til after he got this tax lien out of the way and then he'd sign it."

When the complaint was filed on September 12, 1966, some thirteen months after the contract was signed, Mr. Shea was still riding in the Cadillac.

It was not until counsel filed an answer for him in this suit that he asserted any of the defenses as a reason for failing to comply with the contract.

The evidence is just as susceptible of the inference that Mr. Shea was reluctant to carry out the contract as it is that he was incapable of managing his affairs properly. He attended to other business matters just before and after the date of this contract.

The majority opinion leaves the matter unsettled. So far as the record shows, at no time has anyone offered to return the Cadillac or reimburse Dr. Hodge for the same. The answer in March 1967 says that he is willing to make an adjustment, but the prayer for relief only asks that the complaint be dismissed.