530 S.E.2d 120

Ernest Glenn BROOKS and Morris Glenn Brooks,
as Personal Representatives of the Estate of
Margaret S. Brooks, Plaintiffs,

v.

J. Michael KAY and Buddy Lewis Brooks, Defendants.

J. Michael Kay, Third–Party Plaintiff,

v.

Ernest Glenn Brooks, Individually, and Morris Glenn
Brooks, Individually, Third–Party Defendants,

of whom Ernest Glenn Brooks and Morris Glenn Brooks,
Individually, and as Personal Representatives of the
Estate of Margaret S. Brooks are, Petitioners,

and

J. Michael Kay is, Respondent.

No. 25100.

Supreme Court of South Carolina.

Heard Feb. 16, 2000.

Decided March 27, 2000.

Rehearing Denied May 11, 2000.

480

482

Samuel M. Price, Jr., of Newberry, Robert E. Guess, of Union, and John S. Nichols, of Suggs & Kelly, of Columbia, for all for petitioners.

C. Stuart Mauney, of Gibbes, Gallivan, White & Boyd, P.A., of Greenville, for respondent.

TOAL, Acting Chief Justice:

This case is a property dispute between a deceased woman's children and a man who claims the woman deeded to him her property. The Court of Appeals upheld the transfer. We reverse.

## Factual/Procedural Background

In 1944, Margaret Brooks ("Brooks") and her husband Morris Brooks bought a little over 250 acres of land in Newberry County. They owned the property together as tenants in common. Morris Brooks died in 1982, leaving a life estate in the property to Brooks and the remainder divided among their three children Buddy, Ernest, and Morris ("the Children"). Therefore, after her husband died, Brooks owned a fee simple interest in the entire property along with a life estate.

J. Michael Kay ("Kay") is an avid hunter who met Brooks in the 1980s while hunting on the property adjacent to hers. Kay became friends with Brooks and his hunt club entered into a lease agreement with her for hunting rights to the property. Kay would often bring his children to visit Brooks while he hunted. The hunt club also did favors for Brooks such as fixing the porch of her trailer.

The transaction at the center of this dispute involves a deed granting Brooks' fee simple interest in the 250 acres property to Kay. The consideration for this transfer was only $1.00 plus love and affection. The transaction occurred at the Newberry courthouse on April 28, 1989. According to Kay's testimony, Brooks had often expressed her desire for Kay to get her land instead of the Children.[1] Kay testified that even the thought that he might not get her land would push Brooks to the point of crying in front of him. Kay testified that he contacted an attorney about drafting a deed granting him all of the property except for the parcel of land on which Brooks' trailer resided in order to put the issue to rest. Although Kay contacted the attorney and instructed him on preparing the document, Brooks is the one who actually paid the attorney $50.00 for the deed's preparation.

Incapable of walking by herself, Brooks was physically carried into the Newberry courthouse by Kay along with his two small children so that she could sign and record a deed to Kay. With the assistance of Elizabeth Folk ("Folk"), an employee of the courthouse, Brooks signed the deed and had it witnessed. At this point, the testimony of Kay and Folk

---

1. Even if Kay were to prevail on this appeal, the Children would still retain their remainder interest from Morris Brooks.

differs to a great degree.[2]  Kay testified that during the entire transaction, Brooks made it clear that she wanted to give him all the property, not just hunting rights.  However, for some reason Kay doesn't explain, Folk and Brooks began talking about whether Brooks wanted to grant Kay all her property or just the hunting rights.  Kay testified that he then left the room so that the two women could talk freely about it.  He testified that when he returned, everything was cleared up and Brooks wanted him to have the entire property.  Kay testified that he told Folk to let Brooks do "whatever she wanted to do" with the property, whether that meant giving him hunting rights or the entire fee.

Folk, on the other hand, testified to a very different version of events.  Her version is also substantiated to a greater degree by Jackie Bowers, the courthouse supervisor.  Folk testified that after signing the deed, Kay left the room to pay the filing fee.  While he was gone, Folk and Brooks made small talk about the transaction and hunting.  Folk then discovered that Brooks had intended to only grant Kay the right to hunt on her property, not the entire fee simple.  Folk, through her experience with deeds at the courthouse, explained to Brooks that she was not just giving Kay the hunting rights, but her entire right to the property.  Brooks insisted to Folk that she was only granting hunting rights, not the entire property.

When Kay returned from paying the filing fee, Folk confronted Kay with this information and told him that Brooks had meant to only transfer hunting rights not fee simple to the entire 250 acres.  At this point, Folk testified that Kay had a private conversation with Brooks after which Brooks told Folk to go ahead and take the deed from her for filing.  Kay then left with Brooks to take her back to her trailer.

Immediately after Kay dropped her off at her home, Brooks called the courthouse and ordered them not to record the

---

2.  The distinctions between the two stories are important because they affect the admissibility of Kay's testimony.  The Court of Appeals found Kay's testimony about this transaction, whether properly admitted under the Dead Man's Statute or not, was cumulative to Folk's testimony such that no error could have occurred.  Due to the stark contrast between Folk and Kay's versions of events, Kay's testimony cannot be considered cumulative.

deed. Folk complied with her wishes and the deed was never recorded. Kay admits that the courthouse never mailed him a copy of the deed as he expected them to have done. Also, evidence shows that Kay's wife contacted the courthouse to find out why a copy of the deed had not arrived and was told Brooks had ordered them to keep the deed and not to record it. Kay never brought up the topic of the deed with Brooks. He allowed her to continue to pay taxes on the property after the transaction. He also allowed the Children to sell timber from the property without claiming any interest in the profits. Kay even continued to pay rent to Brooks so that his hunt club could hunt on the property.

In essence, neither Brooks nor Kay changed their position towards the land after the signing of the deed. However, in addition to calling the courthouse on April 28, 1989, the day of the transaction, to prevent the deed from being filed, Brooks also called the courthouse on May 19, 1989 to say she "definitely does not want this deed recorded" according to notations made on the deed by courthouse personnel. Although it is unclear when it occurred, someone at the courthouse also "whited-out" the names on the original deed. Furthermore, the $4.00 filing fee was reimbursed by the courthouse personnel.

Within a year after the transaction, Brooks was committed to the Craft's Farrow State Hospital due to her Alzheimer's disease. In January 1994, Brooks died intestate. In June 1995, the Children brought this action to determine Kay's rights in the land. In December 1996, the trial court issued an order finding Kay had title to the property. In September 1998, that order was upheld by the Court of Appeals in an unpublished opinion. *See Brooks v. Kay,* Op. No. 98–UP–365 (S.C.Ct.App. filed September 10, 1998). The Children have appealed.

## LAW/ANALYSIS

### I. Dead Man's Statute

The Children argue Kay's testimony about his conversations with Brooks concerning her intention to deed him the property should have been excluded by the Dead Man's Statute. We agree.

The South Carolina Dead Man's Statute, S.C.Code Ann. § 19-11-20 (1985) provides, in pertinent part:

[N]o party to an action or proceeding, no person who has a legal or equitable interest which may be affected by the event of the action or proceeding ... shall be examined in regard to any transaction or communication between such witness and a person at the time of such examination deceased, insane or lunatic as a witness against a party then prosecuting or defending the action ... when such examination or any judgment or determination in such action or proceeding can in any manner affect the interest of such witness or the interest previously owned or represented by him....

The rule prohibits any interested person from testifying concerning conversations or transactions with the decedent if the testimony could affect his or her interest. *See Hanahan v. Simpson*, 326 S.C. 140, 485 S.E.2d 903 (1997). The rule is founded on the principle that it is against public policy to allow a witness thus interested to testify as to such matters when such testimony, if untrue, cannot be contradicted. *Id.* at 151, 485 S.E.2d at 909. Because this statute is an exception to the general rule of witness competency, it requires a restrictive reading as to which the party requesting its muzzling effect bears the burden. *Id.*

Due to the restrictive reading of the statute, many exceptions also exist. The Dead Man's Statute will not exclude: (1) testimony where the party asserting the statute "opens the door" by offering testimony otherwise excludible; (2) testimony by the attorney who prepared the will on the ground that the attorney is not an interested person; (3) testimony where the witness's present or previous interest will not be affected by the event of trial; (4) witness testimony that is against his or her interest; (5) testimony about a transaction between the deceased and a third party; (6) the introduction of documentary evidence; and (7) testimony about the acts, demeanor, or conduct of the decedent where the testimony is offered merely for its bearing on an issue of mental competency. *See Hanahan*, 326 S.C. at 152-53, 485 S.E.2d at 909-10. Undoubtedly, applying the Dead Man's Statute to exclude testimony is disfavored. However, if the

statute is not applicable to the current case, then it is hard to imagine the statute has any meaning left at all.

■ Although the trial court admitted Kay's testimony under the mental competency exception, almost all of Kay's testimony had absolutely nothing to do with Brooks' mental abilities. Specifically, Kay's testimony about conversations with her in the courthouse the day of the transfer has no relation to her mental competency. This testimony was central to both the trial court and Court of Appeals' decisions upholding the transfer. The lower courts' reliance on this testimony is even more significant because it contradicts in several respects the testimony given by Folk, the employee at the courthouse who witnessed the transaction. The trial court erred in allowing this testimony under the mental competency exception, and, therefore, Kay's testimony about his conversations with Brooks will not be relied upon by this Court.

■ Furthermore, we cannot rely on a harmless error analysis to avoid the application of the statute because Kay's testimony was not cumulative to any properly admitted evidence. Where testimony in violation of the Dead Man's Statute is cumulative to other properly admitted testimony, the admission of the improper testimony may be held to be harmless. *See McBeth v. Bishop*, 278 S.C. 443, 298 S.E.2d 441 (1982). In this case, Jerry Hancock, Kay's hunting partner, testified that on two occasions Brooks stated her intention was for Kay to inherit the property. Hancock offered no dates or other specifics about these comments. The testimony is vague and at most would allow Kay to make the same broad assertions that Brooks intended to give him the property because he would take care of it and the Children would not. However, the conversations the day of the transfer and at the courthouse were in no way cumulative to anything in Hancock's testimony.

Several inconsistencies between Folk's and Kay's testimony are also significant enough to prevent us from viewing the conversations as cumulative evidence. For example, Kay's testimony that he left the room so that Folk could explain the transaction to Brooks is directly contradicted by Folk's version of the events. Furthermore, Folk testified that she did not hear the conversation between Kay and Brooks in which

he purportedly explained that the deed transferred more than hunting rights and Brooks acquiesced to this change. As such, the portions of Kay's testimony which were erroneously admitted in violation of the Dead Man's Statute were not cumulative to other testimony so as to render its admission harmless error.

## II. Confidential Relationship

The Children argue the Court of Appeals erred in finding the issue of a confidential relationship unpreserved. We agree. The Children further allege that a confidential relationship existed between Brooks and Kay such that the burden of proof should have shifted to Kay on the issue of undue influence. We agree.

### A. Preservation

■ The Court of Appeals held that the trial judge did not rule upon the issue of a confidential relationship, and, thus, the issue was unpreserved on appeal. This holding was in error.

The trial judge's order stated, "The plaintiffs have argued that Kay was in a 'confidential' relationship with Ms. Brooks. However, the presence of such a relationship, and the mere suspicion that improper means were used, is insufficient to support a finding of undue influence." Since the trial court clearly ruled on the matter, against the Children, the matter is proper for review.

### B. Existence of a Confidential Relationship

■ A confidential relationship arises when the grantor has placed his trust and confidence in the grantee, and the grantee has exerted dominion over the grantor. *Bullard v. Crawley*, 294 S.C. 276, 363 S.E.2d 897 (1987). The essence of the relationship is the trust and confidence. *Id.* Mere friendship between the parties is not sufficient. The relationship must be one implying confidence. *Id.* Some evidence is required that the grantor actually reposed trust in the grantee in the handling of her affairs. *Id.*

■ In this case, evidence at trial revealed that Brooks placed her trust in Kay. Kay and the Children testified that Brooks entrusted her important financial papers with Kay.

These papers included her bank passbook, her husband's will, and other valuable papers. Kay testified that she entrusted him with these materials because she did not trust her own son who lived with her or the son's friends who were often in the trailer. Also, one of the Children testified that instead of consulting with the family about the sale of other property owned by Brooks, she sought the advice of Kay. This evidence reveals that Brooks placed her confidence in Kay for both her personal and her business finances.

The challenged transaction also reveals Brooks placed her trust and confidence with Kay. She relied on Kay to prepare everything for the transaction. Kay chose the attorney and told him how to prepare the document. Brooks had no contact with the attorney and, having only a fourth grade education, relied on Kay to ensure that the document reflected their agreement.

Perhaps the strongest evidence of a confidential relationship is that when confusion arose concerning the nature of the transaction, Brooks relied on Kay for an explanation. Initially, Folk testified that Brooks thought she was only signing over the right to hunt on the property to Kay. After Brooks signed the deed transferring her property, Kay left the room to record the deed. Folk then discovered that Brooks had not intended to deed over the property. Upon Kay's return, Folk informed him of the confusion and then Brooks and Kay had a private conversation not heard by Folk. After this conversation, Brooks agreed to let Folk take the deed from them for filing. Based on the circumstances surrounding the transaction in question as well as the evidence that Brooks relied on Kay to keep her important papers and sought his advice concerning business transactions, enough evidence of a confidential relationship existed so that the burden should have been on Kay to prove absence of undue influence.

## III. Undue Influence

■ The Children argue that the deed should be voided on the ground of undue influence. We agree.

■ Brooks' mental weakness combined with the deed's consideration of only $1.00 is sufficient evidence of undue influence to void the transfer.

> It is not necessary, in order to secure the aid of equity, to prove that the deceased (grantor) was at the time insane, or in such a state of mental imbecility as to render her entirely incapable of executing a valid deed. It is sufficient to show that from her sickness and infirmities she was at the time in a condition of great mental weakness, and that there was gross inadequacy of consideration for the conveyance. From these circumstances imposition or *undue influence will be inferred.*

*Owens v. Sweat,* 227 S.C. 112, 124, 86 S.E.2d 886, 892 (1955) (emphasis added). Even if Brooks was mentally competent enough to execute a deed there is no doubt that she was rapidly approaching senility, if not already suffering from the Alzheimer's disease responsible for her commitment to the State Hospital only one year after the transaction in question.

A video tape included with the record on appeal showing Brooks at a picnic was made only a few months after the transaction. The tape reveals a confused, elderly woman who was extremely hard of hearing. The video tape, along with the voluminous stories told by the Children and others of Brooks' forgetfulness and eccentricities, reveals an impaired woman whose mental state was deteriorating.

Brooks' deteriorating mental state combined with the fact that the consideration given for the property was only $1.00 infers undue influence and the deed should be voided.[3] "Even absent a confidential relationship, this court has several times approved the principle ... that imposition or undue influence upon the grantor will be inferred from proof of great mental weakness, not amounting to incapacity to execute a valid deed, accompanied by gross inadequacy of consideration." *Hodge v. Shea,* 252 S.C. 601, 608–09, 168 S.E.2d 82, 85 (1969).

Brooks' actions immediately following the signing of the deed are also significant. Even though Brooks allowed Folk to keep the deed when they left the courthouse, as soon as Kay dropped Brooks off back at her trailer and she was out of his presence, Brooks called the courthouse and instructed them not to record the deed. We infer from her actions that Brooks truly did not want to pass the entire title of her estate

---

3. Kay testified that he was not even sure he gave Brooks the dollar.

to Kay but, due to his influence over her, Brooks did not refuse to do so at the courthouse.

## CONCLUSION

Based on the forgoing, we **REVERSE** the Court of Appeals' decision and void the deed on the grounds of undue influence.

MOORE, WALLER, BURNETT, JJ., and Acting Associate Justice GEORGE T. GREGORY, Jr., concur.